IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 15, 2004 Session

## V.D., ET AL v. N.M.B.

### Appeal from the Circuit Court for Davidson County
### No. 01A119    Marietta M. Shipley, Judge

---

### No. M2003-00186-COA-R3-CV - Filed July 26, 2004

---

The paternal grandmother of an eight year old boy, who had had custody of the child for the most recent four years of his life, filed a petition to terminate the parental rights of his mother so the grandmother could adopt him. The trial court granted the petition, finding clear and convincing evidence of several grounds for termination and that such a step was in the child's best interest. We affirm the termination on the ground of abandonment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., J.J., joined.

Kelli Barr Summers, Brentwood, Tennessee, for the appellant, N.M.B.

Rosemary E. Phillips, Goodlettsville, Tennessee, for the appellees, V.D. and M.S.

### OPINION

The child at the center of this case, M.S.B., was born on August 18, 1994. The child's father M.S., had a serious drug problem and was never involved in M.S.B.'s life. The child's mother ("Mother") had custody during M.S.B.'s first four years, but the child frequently stayed at the home of his grandmother ("Grandmother"), who is M.S.'s mother. During those years, Grandmother also attended to the child's needs by bringing supplies for him and by giving money to Mother.

In April of 1998, Mother was evicted from the housing development where she lived. She then agreed to place her child in the custody of Grandmother so she could go to Louisiana and study cosmetology. There was little or no contact between Mother and the child while Mother was in Louisiana. Mother did not send any Christmas or birthday cards or gifts to her child.

Mother returned to Tennessee in March of 1999. She visited M.S.B. at Grandmother's home three times over the following three months.[1] During the third visit to the paternal grandmother's house, the two women got into an altercation, and Mother took M.S.B. away. Each party subsequently filed criminal charges against the other. Grandmother claimed that Mother assaulted her in the presence of the child. Mother claimed that Grandmother assaulted her.[2]

## I. CUSTODY PROCEEDINGS IN JUVENILE COURT

On June 23, 1999, Grandmother filed a petition for custody of M.S.B. in the Davidson County Juvenile Court. A hearing on the petition was scheduled for August 10. Mother did not appear for the hearing, and the court placed temporary legal custody of the child with Grandmother. Questions of visitation and support were reserved for a later time. After the hearing was over, Mother appeared and stated that she was late because of the bus schedule, and she filed a Notice of Appeal to the juvenile court judge. The case was subsequently referred to a Court Appointed Special Advocate ("CASA") volunteer for home studies of both Mother and Grandmother.

The appeal hearing was conducted on October 21, 1999. Mother was present at the hearing and was represented by court-appointed counsel. She testified, as did Grandmother, three witnesses, and the CASA volunteer. At the conclusion of the hearing, the court ordered that M.S.B. remain in the custody of his grandmother because he felt safe and secure in her residence.

The court's order established a schedule for M.S.B. to visit Mother, with the child to be picked up by Mother at a neutral location. Both parties were made responsible for notifying CASA ahead of time if either party could not visit. The court declared that it would review the case in six months and that it expected Mother to have her GED and her cosmetology classes completed by that time and to show some consistency of employment.

The review hearing was conducted on April 27, 2000, but Mother was not present again. The court subsequently filed an order which did not directly address the question of custody, but made some adjustments to the visitation procedures, and reserved the question of support for a later hearing.

A final hearing on custody was set for February 16, 2001. Mother again failed to appear. She also did not call, and did not make contact with anyone regarding the hearing. The juvenile court granted Grandmother permanent custody of M.S.B. Mother's right of visitation was reserved pending her application to exercise that right. Apparently, she took no steps to arrange visitation, for Mother admitted that she did not visit with her child after September of 2000, and that her only subsequent contact with him was a telephone call on his seventh birthday, August 18, 2001.

---

[1] Grandmother alleges that Mother did not go to Grandmother's home for the purpose of seeing her child, but rather to see the child's father.

[2] The record is unclear on the final resolution of the criminal charges.

## II. TERMINATION PROCEEDINGS IN CIRCUIT COURT

On July 16, 2001, Grandmother filed a petition in the Davidson County Circuit Court to adopt M.S.B. and to terminate the parental rights of Mother.[3] M.S., the child's father, joined in the petition and voluntarily relinquished his parental rights. The petition asserted that Mother had not visited with the child or made any attempt to support him in the four months preceding the filing of the petition. *See* Tenn. Code Ann. § 36-1-113(g)(1). As we indicated above, at the time the petition was filed, Mother had not seen M.S.B. for almost a year. Not only had she failed to visit, but she had not sent him any cards, gifts or letters in over four months.

Mother did not initially file her own response to the petition, but had the pastor of her church submit a response, which asserted that she was a member of the Holy Temple Church and a fit person to exercise custody over M.S.B. The trial judge struck the response because it had not been filed by an attorney or by Mother acting pro se. Mother then filed a pro se answer, identical in substance and wording to the stricken pleading, but with the addition of a large helping of accusations and invective against Grandmother.[4]

The trial court conducted the termination hearing on October 14, 2002. Mother was represented by court-appointed counsel. The only witnesses called were Grandmother and Mother. Grandmother testified that between September 2000 and July 2001, Mother did not exercise any visitation with M.S.B. and did not send him any cards, letters or gifts. She further testified that there were no phone calls and that Mother did not attempt to pass messages to her or to M.S.B. through Mother's family members or other third parties.

Grandmother further testified that she was solely responsible for M.S.B.'s support, education, and healthcare; that M.S.B. had no relationship with his father; and that she did not intend to allow the father to establish such a relationship because of his ongoing drug problem. Grandmother admitted on cross-examination that she did not take the initiative to re-establish the relationship between M.S.B. and Mother, but insisted that she always followed the court's orders in regard to visitation and never discouraged M.S.B. from seeing Mother.

On the stand, Mother confirmed Grandmother's testimony that she had not visited her son for a period considerably longer than the four months prior to the filing of the petition, and that she had sent no cards, letters, or gifts during the same period. She said she had tried to call, but that in every case Grandmother either did not answer or was hostile on the phone. However, she could not remember if any of the attempted phone calls occurred during the relevant four month period.

---

[3]The case was originally assigned to the Fourth Circuit Court. On April 3, 2002, that judge recused herself, and the case was transferred to the Second Circuit Court.

[4]The record also contains a pro se motion for custody filed by Mother in the Juvenile Court on October 19, 2001, three months after the petition for termination and adoption was filed in the Circuit Court.

When she was asked why she did not attempt to visit M.S.B. at Grandmother's house after July of 2000, Mother said it was because she did not want any trouble. Asked why she did not take advantage of the visitation ordered by the juvenile court (which never required her to go to Grandmother's house and provided for a degree of supervision by CASA), she said she just did not want to deal with Grandmother, and that she had decided to stop visitation until the final hearing. She further testified that she had accumulated over fifty gifts for M.S.B., but that she did not want to give them to him until he was returned to her.

Mother claimed that she did not receive all the notices of custody hearings that were sent to her. She testified that she had missed the final custody hearing in February 2001 because she was pregnant, it was snowing at the time, and she had no way to get to court. She subsequently gave birth to a daughter, who was eighteen months old at the time of the termination hearing. Mother testified that she had lived at the same address for almost three years, that her apartment had two bedrooms, that she and her daughter stayed in one bedroom, and that she had furnished the other one for the return of M.S.B. When Mother's attorney asked how the situation with her son made her feel, she stated that "not a day goes by that I don't think about seeing my son again . . . ." At the conclusion of the hearing, the trial court took the matter under advisement.

On December 27, 2002, the court filed a memorandum and order terminating Mother's parental rights. After reciting the facts, the court held that the petitioner had proved three grounds for termination by clear and convincing evidence: abandonment through failure to visit; non-compliance with the permanency plan or plan of care supervised by the juvenile court; and failure to remedy persistent conditions that would prevent the child from being safely returned to Mother. The court also found that based upon the factors set out in Tenn. Code Ann. § 36-1-113(h) it was in the best interest of the child that Mother's parental rights be terminated. This appeal followed.

### III. LEGAL REQUIREMENTS IN TERMINATION CASES

### A. STANDARD OF PROOF

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois,* 405 U.S. 645, 651 (1972). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer,* 455 U.S. 745 (1982); *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent and of the child; the parent shall have no right thereafter to have any relationship, legal or otherwise, with the child. Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996) (quoting *Santosky*, 455 U.S. at 787, 102 S. Ct. at 1412 (Rehnquist, J., dissenting)).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. To justify the termination of parental rights, the party seeking termination must prove both the grounds for termination and that termination is in the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, it was the burden of Grandmother to present "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn by the evidence" that grounds exist and that termination would serve the best interests of the child. *In re Valentine*, 79 S.W.3d at 539.

## B. THE RECORD ON APPEAL

The trial court began the hearing by identifying and reciting from the documents in the juvenile court's file regarding the custody proceedings. Neither party had sought the introduction of the juvenile court files, and it appears the trial court had obtained them from the clerk. The court stated it had read through all the records and that it could take judicial notice of the filings in juvenile court.[5] Neither party objected, and those documents have been included in the record supplied to us as trial exhibits. Many of the facts gleaned from those documents, *e.g.*, that Grandmother was granted custody by juvenile court order, are contained in the pleadings and/or testimony in the termination case.

Although this court often receives records in termination cases from juvenile courts that include everything filed with regard to the subject child in juvenile court prior to the termination case, an appellate court cannot consider those filings when reviewing the termination decision. "The appellate record in an appeal from a final termination order should consist only of (1) the petition to terminate parental rights and all pleadings and other papers subsequently filed with the lower court, (2) a transcript or statement of the evidence of the termination proceedings in the lower court, (3) the original of all exhibits filed in the lower court in the termination proceeding, and (4) any other matter designated by a party and properly includable in the record on appeal." *In re M.J.B. & M.W.S., Jr.,* No. M2003-01167-COA-R3-PT, 2004 WL 769252, at *6 (Tenn. Ct. App. April 8, 2004)(perm. app. denied July 12, 2004). Thus, court orders and other filings preceding a termination of parental rights petition must be properly introduced into evidence at the termination hearing to be included in the appellate record.

The constitutional magnitude of the rights involved in a termination case requires strict adherence to evidentiary rules. Custody proceedings tend to be much more informal in nature, and involve "different goals and remedies, different evidentiary standards, and different avenues for appeal." *Id.* at * 5. Because there was no objection to the trial court's consideration of the juvenile

---

[5]*But see Hughes v. State*, 451 S.W.2d 696, 697 (Tenn. Crim. App. 1969) (finding orders of other courts are admissible if properly authenticated); Tenn. R. Evid. 202.

court filings, because they were included as exhibits, again without objection, and because there was testimony about them, we will consider the juvenile court orders and pleadings. They establish the history of the parties with the courts.

The record on appeal also includes a post-hearing "Report to the Court" filed by Mother's attorney that documented a conference call between both parties' counsel and the judge. The call and the report were in response to comments by the trial court at the close of the evidentiary hearing in which she left open the possibility of additional proof regarding Mother's attempts at visitation after the last juvenile court order, including specifically any information CASA might have in that regard. Mother's counsel reported he had contacted the former CASA volunteer who had worked with Mother and that volunteer stated that she did not recall if she talked to Mother after the juvenile court ceased Mother's visitation. Those statements are, of course, hearsay, and cannot be relied upon by the court to determine the termination of parental rights issue. *Toms v. Toms*, 98 S.W.3d 140, 144-45 (Tenn. 2003). The statements themselves, however, obviously prove nothing, so the trial court could not have relied on them in reaching its decision.

## IV. ISSUES ON APPEAL

### A. ABANDONMENT

Abandonment is a ground for termination of parental rights, Tenn. Code Ann. § 36-1-113(g)(1), and is defined in Tenn. Code Ann. § 36-1-102(1)(A)(i) as willfully failing to visit or willfully failing to support the parent's minor child for a period of four consecutive months immediately preceding the filing of a pleading to terminate the parent's rights to that child.[6] Willful failure to visit is defined as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Our Supreme Court has declared that the statutory requirement of willfulness is also a constitutional requirement. *In re Swanson,* 2 S.W.3d 180 (Tenn. 1999).[7] The failure to support or visit must be intentional. *In the Matter of D.L.B.,* 118 S.W.3d 360, 367 (Tenn. 2003) (stating that *Swanson* dictates that an element of intent must be applied to the statutory definition of abandonment).

Mother testified that she did not visit M.S.B. during the relevant four-month period for application of § 36-1-113(g)(1), but she insists her failure to visit was not willful. She explains her

---

[6]Mother's failure to visit the child during the four months prior to the filing of the petition was the sole basis for the adjudication of abandonment in this case. Failure by Mother to pay for the support of M.S.B. is not an issue in this appeal. The trial court determined there was never a court order requiring Mother to pay child support. Although there is some authority that a duty to support exists regardless of court order, Grandmother has not challenged the trial court's finding on appeal.

[7]After the *Swanson* decision, the General Assembly cured the constitutional defect that had invalidated Tenn. Code Ann. § 36-1-102(1)(D) by enacting a new § 36-1-102(1) that made willfulness a requirement of failure to support and failure to visit. *See In the Matter of D.L.B.*, 118 S.W.3d 360, 365 n.2 (Tenn. 2003).

utter lack of contact by the assertion that she did not want any trouble with Grandmother and that Grandmother made it difficult for her to arrange visitation.

Mother also pointed to lack of transportation as a factor and her duty to tend to her younger child's needs. In response to questions as to why she did not send cards, gifts or letters to her son, Mother claimed that she had fifty gifts for M.S.B., all wrapped and sitting in a dresser drawer, but that she did not want to give them to him until he was returned to her custody.

The concept of willfulness, or intent, is at the core of the definition of abandonment and is often the determining factor in whether a petitioner has shown the existence of that ground by clear and convincing evidence. *See, e.g.*, *In re L.J.C., A.L.C., and J.R.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003) (holding that the record did not provide clear and convincing evidence that an indigent mother intended, rather than was simply unable, to pay child support); *In re A.D.A.*, 84 S.W.3d 592 (Tenn. Ct. App. 2002) (holding that the proof did not show that the mother's failure to visit was intentional rather than the result of a number of circumstances including DCS's placement of the child in another county).

This court has frequently been called upon to decide cases where the parent whose rights are subject to termination on the ground of abandonment has argued that a failure to visit or failure to support was not willful, but was caused by events beyond that person's control.[8] The question of intent or willfulness is fact specific and depends on the totality of circumstances. It is a question of fact that the trial court is in the best position to make. *In re D.L.B.*, 118 S.W.3d at 367. However, those facts must be applied to a standard definition of willfulness.

> Willful conduct consists of acts or failure to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

*In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at * 5 (Tenn. Ct. App. Nov. 25, 2003) (no Tenn. R. App. P. 11 application filed) (citations omitted).

---

[8]After the Supreme Court invalidated the statutory definition of willful failure, the pre-statute definition applied. *Swanson*, 2 S.W.3d at 189. Under that standard, "[t]he evidence must clearly show a conscious disregard or indifference to the parental obligations for a court to forfeit the parental rights and obligations." *Koivu v. Irwin*, 721 S.W.2d 803, 807 (Tenn. Ct. App. 1986). Additionally:

> To determine an abandonment the court is not to look at the protestations of affections and intentions expressed by the natural parents, but look at the past course of conduct. Non-exclusive factors that prior case law reveals include, as to those situations where the child is removed from the parent, the amount of support given to the child, the degree of contacts and visits with the child and whether gifts were sent on special days. Also, there are considerations of whether the child was voluntarily removed to another person and whether such a removal was acquiesced in. The length of time the child is away from the natural parent during the period at issue is also a factor.

Although another party's conduct can affect a party's ability to support or to visit, *see In re Swanson,* 2 S.W.3d at 185-186; *In re Menard,* 29 S.W.3d 870, 874 (Tenn. Ct. App. 2000), mere efforts to frustrate or discourage visitation or support do not necessarily justify a parent's failure. Generally, such conduct by a third party must amount to a significant restraint or interference. *In re Muir*, 2003 WL 22794524, at * 5.

We do not wish to minimize the difficulties a parent may encounter in trying to arrange visitation with a child who is in the custody of a guardian who is less than helpful in making those arrangements. It appears to us, however, that such difficulties do not excuse a parent from attempting to maintain a relationship with a child through whatever means are feasible. Mother did not make that attempt. Additionally, Mother did not establish that she tried to visit but Grandmother obstructed the visit.

Mother resided in the same county as her son, and there was no mystery as to his location. Because of tensions between Mother and Grandmother, the juvenile court made arrangements for Mother to exercise visitation without having to go to Grandmother's house. The services of CASA were made available to Mother in order to facilitate arrangements and to deal with any problems, and she could have sought the assistance of the court if she believed that Grandmother was preventing her from visiting. In its final order awarding custody of the child to Grandmother, the juvenile court relied upon the testimony of the witnesses at the hearing on February 16, 2001, including CASA representatives, to specifically find that Mother had last made contact with CASA in September, 2000.

Instead of availing herself of the resources and arrangements available to her, Mother's testimony shows that she made a conscious decision to forego any visitation with her son until after the final proceeding.[9] Although she asserted that her relationship to her son was very important to her, she chose a course that was bound to weaken that relationship. She did not attempt even minimal contact through a card, letter, or gift.

The evidence does not preponderate against the trial court's finding that Mother abandoned her son by willfully failing to visit for more than the requisite period. To the contrary, Mother's own admissions prove that she willfully failed to exercise visitation with her son and that her failure to visit extended over a far longer period than the four months required by statute. Thus, abandonment has been proved by clear and convincing evidence.

## B. NON-COMPLIANCE WITH THE PERMANENCY PLAN

Although Tenn. Code Ann. § 36-1-113(g) sets out several possible grounds for termination of parental rights, only one of those grounds need be proven for a valid termination to be ordered, so long as it is proved by clear and convincing evidence and it is also proved that termination is in the best interest of the child or children. *In the Matter of D.L.B.*, 118 S.W.3d at 367; *In re H.E.J.,*

---

[9]Mother presumably meant the final custody hearing in juvenile court, which she did not attend.

124 S.W.3d 110, 113 (Tenn. Ct. App. 2003). Since we have found the ground of abandonment was proved by clear and convincing evidence, any failure of proof on other grounds does not affect our decision. However, since the trial court did find that there were other grounds to justify termination, we will briefly address those grounds in light of the Supreme Court's statements in *In the Matter of D.L.B.* that a trial court should make finding of fact and conclusions of law with regard to each ground considered in order to avoid delay in a child's permanent placement. 118 S.W.3d at 367.

The trial court found that "[t]here was substantial non-compliance with the permanency plan or plan of care supervised by the Juvenile Court, throughout the custody proceeding." The actual language in Tenn. Code Ann. § 36-1-113(g)(2) is: "There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4."

In Tenn. Code Ann. § 37-2-402(8), "permanency plan" is specifically defined as "a written plan for a child placed in foster care with the Department of Children's Services or in the care of an agency as defined in subdivision (1) and as provided in Tenn. Code Ann. § 37-2-403 . . . ." Tenn. Code Ann. § 37-2-403 details the provisions that must be included in any permanency plan and also indicates that "permanency plan" and "plan of care" are to be treated as synonymous terms.

There is nothing in the record of this case to suggest that a permanency plan meeting the statutory definition has ever been put in place for M.S.B. The child was never placed in foster care or with an agency; his custody was never given to the Department of Children's Services. It may be true, as the trial court indicates, that Mother failed to comply with the orders of the juvenile court regarding education and employment, but such orders do not constitute a permanency plan as defined by the statute, and non-compliance with those orders does not satisfy the specific statutory ground.

The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d at 622. Because there was not permanency plan meeting the statutory definition, Grandmother did not prove the statutory ground of failure to comply with a permanency plan.

## C. PERSISTENCE OF CONDITIONS

The trial court also analyzed the lack of progress in Mother's circumstances under another ground for termination described in Tenn. Code Ann. § 36-1-113(g) as follows:

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (I) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to

further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Under the clear language of the statute, the conditions which prevent the child's safe return to the home may be either (1) the conditions that led to removal or (2) other conditions likely to cause further neglect. Herein, the trial court found that M.S.B. had been removed from Mother's home by the Juvenile Court for over two and one-half years and that there was little likelihood that "these conditions" would be remedied in the near future. With regard to conditions, the court discussed Mother's lack of a stable source of income, failure to complete her cosmetology course, and little progress toward the goals set by the juvenile court. The court further found there was no guarantee that the child would be in a safe place.

The original order from juvenile court giving temporary custody to Grandmother does not state the reason for that decision, but stated it was based on testimony from Grandmother and that Mother did not appear. In the second order, based on an appeal of the first, the juvenile court judge continued temporary custody with Grandmother, finding that Grandmother's home "is where he has spent most of his time and especially most recently. It appears that the child feels safe and secure in that residence."

Mother testified at the termination hearing that, when she left her child with Grandmother, she had wished to better herself economically by going to cosmetology school in Louisiana (where she had some family support, and where a G.E.D. was not required for enrollment). She further testified that she had completed her G.E.D.[10] and had also completed all her required cosmetology courses.[11] She stated that she planned to take her state licensing test the next month, and that if she passed she would easily be able to get a job at a beauty salon. The proof also showed that her primary source of income was AFDC for her youngest child. Her only other source of income was making candy in her apartment and selling it to her neighbors. She had lived in the same apartment for three years.

---

[10] In one of its later orders, the juvenile court found Mother had obtained her G.E.D.

[11] As of the last juvenile court hearing, Mother had not completed all her cosmetology classes, according to the order.

We cannot conclude that there was clear and convincing evidence that conditions persisted in Mother's home or in her situation that prevented a safe return of child to her custody. There was simply no evidence of any dangerous conditions, and the trial court found that Mother's home was apparently safe. While Mother had not complied with the juvenile court's orders regarding stable employment and had not timely complied with the requirement that she finish her cosmetology courses, we cannot say that conditions were such that returning the child to Mother's home would in reasonable probability lead to neglect or abuse. There was simply no proof Mother was unable to adequately parent M.S.B. Although Mother was the author of many of her problems, including her failing to maintain steady employment or complete the requirements for a cosmetology license over a number of years, in view of her testimony we cannot conclude there are conditions preventing the safe return of the child or that there is little likelihood those conditions would be removed in the near future. Consequently, we find that the ground of persistence of conditions was not proved by clear and convincing evidence.

## D. BEST INTEREST OF THE CHILD

Our Legislature has given the courts guidance on some of the factors we must consider when determining the best interest of a child involved in a termination proceeding. Tenn. Code Ann. § 36-1-113(I) reads,

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The trial court went through each of the statutory factors and made findings with regard to each. The most significant were that Mother had not made any adjustments of circumstances so that the child's return to her home would be in his best interests, citing specifically her failure to visit or make contact with her son, even though resources were made available to her. In addition, the court found Mother had not maintained regular visitation or other contact with the child and that, consequently, there was currently no relationship between Mother and her son. Finally, the court found that a change of caretakers now would likely have a detrimental effect on the child's emotional and psychological well-being.

During M.S.B.'s first four years, he spent a great deal of time with his grandmother and in her house. Subsequently, M.S.B. lived with Grandmother after April of 1998, and Grandmother had court-ordered custody since August of 1999. In the last four years prior to trial, Mother's contact with her son was sporadic. Mother has not visited or had meaningful contact with her son since September of 2000, and she has never paid child support.

Grandmother has been the stable presence in the child's life. She has provided an environment that is secure and nurturing. At the time of the hearing, M.S.B. was in second grade, and was doing well. His grandmother regularly helps him with his homework. He has a regular pediatrician, a dentist, and a counselor. Grandmother herself goes to a counselor when issues arise that she does not know how to handle.

Grandmother is fully prepared to meet the physical, emotional, educational and medical needs of M.S.B., while Mother's testimony indicates she has very little concept of what might be involved in meeting the needs of a child of M.S.B.'s age.

Stability is very important to a child's well being, and the permanence provided by finalizing and making permanent the child's situation furthers the child's best interest. We agree with the trial court that it is in the best interest of M.S.B. that Mother' parental rights be terminated so that he can be adopted by Grandmother.

## V.

We affirm the judgment of the trial court. This case is remanded to the Circuit Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellant.

_____

PATRICIA J. COTTRELL, JUDGE