# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

RE:   The Matter of          )
      Ashley Michele Menard   )
D.O.B.   5/7/96              )
SSN:     [Redacted]         )
                  )
By:   MICHAEL GEORGE MENARD    )
      and CAROL FRANCES MENARD,  )
                  Appeal No.
                  )  M1999-00117-COA-R3-CV
      Petitioners/Appellees,   )
                  )  Montgomery Chancery
and ANGELA VEYS MENARD,       )  98-02-0044
                  )
      Co-Petitioner/Appellee,  )
                  )
VS.                          )
                  )
BRYANT LEO MEEKS,            )
                  )
      Respondent/Appellant.    )

FILED

**February 29, 2000**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

## APPEAL FROM THE
### CHANCERY COURT OF MONTGOMERY COUNTY
### AT CLARKSVILLE, TENNESSEE

### THE HONORABLE MURIEL ROBINSON, JUDGE
### SITTING BY DESIGNATION

FOR APPELLEES:

JOHN J. HOLLINS, SR.
Nashville, Tennessee

FRANK J. RUNYON
Clarksville, Tennessee

FOR APPELLANT:

MARK R. OLSON
Clarksville, Tennessee

## REVERSED AND REMANDED

BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

CONCUR:
KOCH, J.
COTTRELL, J.

## **O P I N I O N**

The trial court terminated the parental rights of a teenage father on the ground of abandonment, and granted the adoption petition of the maternal grandparents. We do not believe that the grandparents proved abandonment by clear and convincing evidence. We therefore reverse the order terminating the father's parental rights and granting the grandparent's adoption.

## I. A Wanted Child, but an Unwanted Father

Bryant Leo Meeks (hereafter Leo Meeks) and Angela Veys Menard dated each other in high school. Angela lived with her parents, petitioners Michael George Menard and Carole Frances Menard. Leo Meeks lived with his father, attorney Thomas Meeks. In November of 1995, after Angela discovered that she was pregnant by Leo, a meeting between the prospective grandparents took place at the Menard home.

According to Thomas Meeks, Michael Menard began the meeting by telling him "I am going to kill your son," and Thomas Meeks responded that Mr. Menard could "can that talk," and calmed him down. Leo and Thomas Meeks both testified to other verbal threats directed against Leo Meeks by Michael Menard at different times, including talk of body bags. Mr. Menard denied that he threatened Leo on this or any other occasion.

Both families agreed that since they were all Catholic, abortion was not an option . Michael Menard was adamant that he did not want Leo Meeks to come around their house, and Thomas Meeks agreed to prevent Leo from doing so because he was concerned for his son's safety. He also said he would not file a legitimation petition on behalf of Leo if the Menards did not file for adoption.

Thomas Meeks agreed to pay half of Angela's childbirth expenses, and stated that he was willing to pay support after the child was born. In

February of 1996, the Menards called Thomas Meeks' office and told him what his share of Angela's medical expenses amounted to, and he tendered a check for $476.95 to the Menards. The check was never cashed. The Menards made no further request of either Thomas or Leo Meeks for medical expenses or for support.

When Angela Menard went into labor, no one from the Menard family called Leo or Thomas Meeks. Leo Meeks heard about the impending delivery from a friend, and left work to go to the hospital. The security officers in the hospital lobby told him to leave, and threatened to have him arrested for trespassing if he didn't. The Menards claimed that they had told a hospital employee that Leo should not be allowed in, because he made a drunken and threatening phone call to Angela. When the birth certificate for Ashley Michelle Menard was filled out, the place for the name of the father was left blank.

After the baby was born, the Menards took her home and became her primary caregivers. The record is clear that they did not allow Leo Meeks to see Ashley. They claimed that they were just following their daughter's wishes in that regard. They also claimed that they were concerned about Leo's influence on the child, because he drank, smoked marijuana, and had a bad temper. The Menards allowed other friends of Angela to visit at their house. When these friends were cross-examined at trial, almost every one of them admitted drinking, but refused to answer questions about marijuana use by invoking their Fifth Amendment rights against self-incrimination.

The evidence showed that Angela herself was ambivalent about Leo. Before Angela learned that she was pregnant, Leo had started seeing someone else. After the baby was born Angela wanted to get back together with him (at least for a while). When Leo said he didn't want to do that, she made it clear that he would not get to see Ashley. However, Leo testified that he did see his

-3-

daughter twice, when Angela brought her to Diane's Diner for that purpose. During her testimony, Angela denied that those meetings had taken place, or that she had ever been in Diane's Diner in her life.

Angela was in the same high school classes as Leo, and they sometimes passed notes back and forth about their situation. One of Angela's notes was entered into evidence. Among other things, she wrote:

> "If you want to see my daughter I told you, you could come to my house any time. I feel that it is not my responsibility to bring her to see you because if you had my daughter and your parents hated me, I would still walk through the doors . . . .
>
> I'm sorry sweetheart but sometimes you have to give up a lot in life and I have but you can't. Like I told you before, if you want to give me child support open a bank account and when she's old enough and she wants it she can have it but as for now she's not old enough to make her own decision . . . .
>
> If you want to see my daughter bring your ass up there and see her. And child support, start putting the money away cause as of now we don't need it."

Despite language in the note that may arguably indicate some openness to allowing Leo to see his child, Angela and her family made it as difficult as possible for him to establish a relationship with her. For example, since Leo did not feel he could visit Ashley at the Menard home, he left a gift of baby clothing on their doorstep late at night. The gift was never given to the baby, but was returned to Leo at Angela's direction by her girlfriend.

During high school graduation in May of 1997, Angela and Leo sat next to each other because their names followed each other alphabetically. Mrs. Menard was higher up in the stands holding Ashley. Leo said he would go up there to see the baby. Angela pleaded with him not to, and promised that if he refrained, she would let him see Ashley after he returned from a post-graduation

Florida trip. When Leo returned, Angela told Leo he could only see his daughter if he took a drug test first.

## II. Termination and Adoption

On February 9, 1998, Michael and Frances Menard filed a petition to adopt their granddaughter. Angela Menard joined as co-petitioner to surrender her parental rights. Leo Meeks was referred to in the petition as "the alleged biological father" and the petitioners prayed the court to terminate his parental rights on the grounds of failure to seek reasonable visitation and failure to support.

All the judges of the 19th Circuit recused themselves from this action because Thomas Meeks practiced in their courts. Judge Muriel Robinson of the 20th Circuit was appointed by the Supreme Court to hear the case. In the first hearing on pending motions, the trial court legitimated Ashley as Leo Meeks' daughter, vested legal and physical custody in the maternal grandparents, ordered supervised visitation between Ashley and Leo every other Sunday for two hours, enjoined the parties from making any threats against one another, and ordered Angela and Leo to start paying child support to the grandparents.

The final hearing on the adoption began on March 23, 1999. As co-petitioner, Angela Menard testified that she wished to surrender her parental rights only if her parents succeeded in adopting Ashley, and she reserved her right to revoke the surrender if the Court did not agree. The hearing lasted three days, and was hard-fought on both sides. Twenty witnesses were called to the stand. At the conclusion of the evidence, the judge announced detailed findings of fact from the bench, including the following:

> ". . . the proof shows that the birth mother and her parents have interfered with the father's relationship with this child. They interfered with visitation. They would

not accept support. They did not seek support other than this one-half of this medical bill that Mr. Tom Meeks paid."

Despite these findings, the trial judge terminated Leo Meeks' parental rights. The Final Order of Adoption included the following:

> 15. The Court finds by clear and convincing evidence that the grounds for termination of parental rights have been established, and that the Respondent, Bryant Leo Meeks, has abandoned the child, Ashley Michelle Menard. For a period of four (4) consecutive months immediately preceding the filing of the Petition for Adoption, the Respondent, Bryant Leo Meeks, has willfully failed to visit and has willfully failed to support or make reasonable payments towards the support of the child, Ashley Michelle Menard.

This appeal followed.

## III.  Statutory Constraints

The apparent disjunction between the court's finding that the Menards interfered with Leo's visitation and did not accept support, and its conclusion that Leo Meeks had willfully failed to visit or to support his daughter can be explained by an amendment to the adoption statute that purported to remove the element of willfullness from the definitions of "willfully failed to support" and "willfully failed to visit."

Though modified from time to time, the grounds and procedures for termination of a parent's rights to the society and companionship of his child have been long established, and are to be found in the adoption statutes, Tenn.Code.Ann. § 36-1-101, et seq.

Tenn. Code. Ann. § 36-1-113 reads in pertinent part:

(a)    . . .
(b)    . . .

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

. . .

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

. . .

The definition of abandonment found in Tenn. Code. Ann. § 36-1-102 reads:

As used in this part, unless the context otherwise requires:

(1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;

In 1995, the legislature modified the definition of abandonment by adding the following language to Tenn. Code. Ann. § 36-1-102:

(D) For purposes of this subdivision (1) "willfully failed to support" or "willfully failed to make reasonable payments towards such child's support" means that, for a period of four (4) consecutive months, no monetary support was paid or that the amount of support paid is token support.

. . .

> (G) "Abandonment" does not have any other definition except that which is set forth herein, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition . . . .

The effect of this language was to remove the element of intent from the definition of abandonment, and to create an irrebuttable presumption of abandonment where a parent fails to provide support for four months, regardless of the circumstances. Judge Robinson had previously declined to terminate a father's parental rights in a case somewhat similar to the present one, and her determination that the father had not abandoned his child had been reversed by this court on the basis of the above definition. *Bryant v. Bryant,* Tenn. Ct. App. No. 01A01-9806-CV-00337 (Filed Nashville, February 1, 1999).

## IV. The Swanson Case

After the trial court's decision in the present case, but before oral argument to this court, the Tennessee Supreme Court had the opportunity to consider the constitutionality of the 1995 amendment to Tenn. Code. Ann. § 36-1-102. The case was *Swanson v. Tennessee Baptist Children's Homes, Inc.,* ___ S.W. ___ (Tenn. 1999).

Mr. and Mrs. Swanson were separated, and moved frequently to different towns and states. Mrs. Swanson obstructed Mr. Swanson's attempts to maintain contact with his daughter. After Mrs. Swanson died, The Department of Human Services held a dependency and neglect hearing, and took over custody of the child. DHS was falsely informed that the father was dead.

The Tennessee Baptist Children's Homes filed for adoption. Although they had learned that the father was alive, and that he lived somewhere

in Missouri, they made no effort to contact him. The trial court terminated the father's rights, and we affirmed, because we felt compelled to apply the statutory definition of abandonment.

On appeal, the Supreme Court reasoned that a parent has a constitutional right to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645 (1972). Since the new statutory definition created an irrebuttable presumption of abandonment where a parent fails to provide support, regardless of whether or not the failure was intentional, this precluded the kind of individualized decision-making that is required when a fundamental constitutional right is at stake. The Court therefore found that Tenn.Code.Ann. § 36-1-102(D) was unconstitutional. The effect of the Court's decision was to restore the definition of abandonment as it existed before the 1995 amendment, with the element of intent intact.

## V. Proof of Intent

Though much of the evidence in this case was controverted, it was the petitioners' burden to prove the grounds for termination by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113. Without the irrebuttable presumption to rely upon, the evidence in the record simply does not support the conclusion that Leo Meeks abandoned his child or that he willingly failed to support her. The proof shows rather that Leo wanted to establish a relationship with his daughter, but that the Menards did everything they possibly could to prevent him from doing so.

Though it is undisputed that Leo Meeks did not pay any child support before the Menards filed their petition for adoption, there was evidence that he would have been willing to pay such support if Angela or the Menards had been willing to accept it. In particular, the failure of the Menards to cash the

check from Thomas Meeks indicates their unwillingness. The note from Angela to Leo, quoted above, creates an inference that Leo had made an offer of support, but that it had been turned down.

Though we must reverse the trial court, we must also state that we are not determining the question of what custody arrangements will serve the best interests of the child. Angela and Leo are both young, and both still desire to get an education. It is probable that the grandparents will continue to play an important role in Ashley's upbringing, but that question need not be decided by this court, nor for that matter by any court, if Ashley's parents and her grandparents can manage to come to an agreement.

## VI.

The order terminating the parental rights of Leo Meeks and granting the order of adoption is reversed. This cause is remanded to the Chancery Court of Montgomery County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellees, Michael George Menard and Carole Frances Menard.

_____
BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

CONCUR:


_____
WILLIAM C. KOCH, JR., JUDGE


_____
PATRICIA J. COTTRELL, JUDGE

-10-