IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 20, 2011 Session

## IN THE MATTER OF: DYLAN M. J.

**Appeal from the Chancery Court for Marshall County**
**No. 15176      James B. Cox, Chancellor**

_____

**No. M2010-01867-COA-R3-PT - Filed March 17, 2011**

_____

The mother and stepfather of a nine year old boy filed a petition to terminate the parental rights of the boy's father, who was incarcerated at the time the petition was filed. The sole ground alleged in the petition was abandonment by failure to pay child support. After a hearing, the trial court terminated the father's rights. The court ruled that the ground of abandonment had been proved because there was clear and convincing evidence that the father had failed to support the mother during her pregnancy, and that the father had subsequently shown wanton disregard for the welfare of the child prior to his incarceration. The court also found that termination of the father's rights was in the child's best interest. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D BENNETT and RICHARD H. DINKINS, JJ., joined.

M. Quinn Brandon Stewart, Lewisburg, Tennessee, for the appellant, M. A. J.

William M. Haywood, Lewisburg, Tennessee, for the appellees, S. W. H. and B. N. H.

### OPINION

#### I. BACKGROUND

The child at the center of this case, Dylan M.J., was born out of wedlock on October 9, 2000. S.W.H. ("Mother") was sixteen years old and in high school when she became pregnant with him. M.A.J. ("Father"), also in high school, was fifteen. Father acknowledged that he did not provide any money for Dylan's prenatal care, or for delivery or post-delivery care. He testified, however, that after the birth of the child, he visited him "as much as she

would allow."

M.A.J. filed a petition to be declared Dylan's father "several months" after the child's birth. The petition was granted sometime in 2001. The court ordered Father to pay child support, and it established a visitation schedule which allowed Father to visit with the child every other weekend.[1] Father testified that he paid support in accordance with the order, but that he fell behind from time to time and had to catch up.

When Father's petition was granted, he was living in Columbia with his parents while Mother was living in Lewisburg. Father exercised visitation by driving to Lewisburg, picking the child up on Friday evening, and bringing him back to his parents' house where the child stayed until Sunday afternoon. Father testified that he managed to exercise his weekend visitation at least eighty percent of the time. Father's father testified that Father would usually go out at least once during each visitation weekend after the child went to bed.

In 2006, Father and his parents moved to Mississippi. Visitation became more difficult and more sporadic after that, because it was an eight hour drive to Columbia each way. After making the drive, Father and his father would usually stay in a motel or with relatives over the weekend, and visitation would take place there. Father testified that he stopped paying support for several months during that period because he was unable to see Dylan.

Father's criminal history was a major factor in the trial court's ruling in this case. Father admitted that he started using marijuana at age fifteen and that he was charged several times with underage consumption of alcohol. In 2003, he was arrested for possession of marijuana for resale and with theft of property with a value between $1,000 and $10,000, both felonies. He was convicted on both charges, and was put on probation.

One fateful weekend in April of 2007, Dylan was visiting Father in Columbia. After Dylan went to bed, Father left the child with his parents and went out. In the course of the evening, Father became intoxicated and was involved in an automobile accident which apparently caused two people to suffer serious injuries. As a result, charges were brought against Father for vehicular assault and violation of probation. Father went to jail after the accident, and he did not visit Dylan or pay child support for the next nine months. Father was eventually convicted on both charges, and he was sentenced to eight years in prison. He began serving his sentence in December of 2008.

---

[1]Neither M.A.J's petition to establish parentage or the order resulting from that petition are found in the appellate record of this case.

While Father was struggling with his legal issues, Mother's situation stabilized. She began dating B.N.H. ("Stepfather") in 2003. They formed a strong bond, which included Dylan. They married on August 13, 2006, and became parents of another child, a daughter, in 2007. The proof showed that Stepfather has been a fixture in Dylan's life since the child was three. Stepfather coached Dylan's baseball team and was his cub scout leader. Dylan calls Stepfather "Dad," although he knows who his biological Father is and is aware that he is in prison.

## II. A PETITION FOR TERMINATION

On June 26, 2009, Mother[2] and Stepfather filed a petition in the Chancery Court of Marshall County for termination of Father's parental rights and for adoption. The petition recited many of the facts set out above, including Father's failure to pay support during Mother's pregnancy. The petition also stated that "[M.A.J.] has not paid any child support for the minor child in excess of four months," and that Father's child support arrearage amounted to $7,336.80. The petition also declared that,

> M.A.J. is currently incarcerated and has been incarcerated since 2008, and is serving an eight year sentence. He has had no contact with the minor child nor has he paid any support for the minor child since his incarceration. Prior to his incarceration, his visitation was sporadic, averaging approximately 1 weekend per month. On the date of his criminal activity that led to his incarceration, he had physical custody of the minor child.

The only ground for termination alleged in the petition was that Father "has willfully abandoned the minor child, that he has failed and refused to pay child support, visit or in any way be a part of the life of this child . . ." After the petition was filed, the court appointed a Guardian ad Litem to represent the interests of the child.

Father filed an answer to the petition, in which he denied, among other things, that he had failed to pay child support in the four months prior to his incarceration or that he had only exercised visitation one weekend per month. He admitted that the accident that led to his incarceration occurred on a day that Dylan was visiting, but he noted that the child was not with him at the time of the accident, but was asleep in bed at the home of his parents.

The trial on the petition was conducted on April 21, 2010. Father, Mother, Stepfather,

[2]Mother does not have standing to petition for termination of Father's parental rights, but Stepfather, as a prospective adoptive parent does. *Osborn v. Marr*, 127 S.W.3d 737, 739-40 (Tenn. 2004). On the other hand, Mother is a necessary co-petitioner for the adoption. Tenn. Code Ann. § 36-1-117(f).

Dylan, Dylan's paternal grandfather, his paternal great-grandfather, and his maternal grandmother all testified. We note that one of the most striking and refreshing aspects of this case has been the degree of civility and the lack of rancor between Dylan's parents and their families. Although they disagreed as to the most desirable outcome for the trial court to reach, it is apparent from their testimony that all the parties and all the witnesses were deeply concerned about Dylan's well-being.

The trial was bifurcated, with evidence as to grounds for termination heard first, followed by evidence as to the best interest of the child. We have already discussed much of the substance of the evidence in the first section of this opinion. The evidence as a whole showed that after Dylan was born, Mother stepped into the role and responsibilities of parenthood and that Father was always far less involved. After Stepfather came into the picture, he also took a more prominent role than did Father in parenting Dylan, especially as Father's legal problems escalated. Nonetheless, after his petition to be recognized as Dylan's father was granted, Father remained interested in and involved in his son's life and, although his performance was sporadic at times, he visited with his son and paid support until he was sent to prison.

Father testified that he last saw Dylan for his birthday on October 8, 2008, one month before going to prison. He also testified that he wrote letters to Dylan from jail and then from prison. An exhibit entered into the record consists of copies of seventeen letters and a Christmas card, sent by Father to Dylan between November of 2009 and April of 2010. The letters do not for the most part convey much information, but in all of them Father expressed regret for his actions, and directed words of love and encouragement towards his son. In one letter, Father announced that he had passed his G.E.D., and that he was really proud of himself.

When Mother took the stand, she testified that Father's child support payments were often sporadic. An exhibit entered into the record during her testimony was a printout giving the dates and amounts of twelve child support payments Father made between March and October of 2008, totaling $1,400. Mother testified that Father missed quite a few payments during this period, and that the total amount he paid was less than was ordered by the court, but it is apparent that Father did take his obligation of support seriously.

Dylan testified in chambers that he didn't have much memory of Father before he reached the age of seven or eight, but that he did remember frequent visitation with him after that time, often in the apartment of Dylan's great-grandparents. He also testified that he knew that Father was in prison and that it made him feel bad, but that he likes getting mail from him.

After closing arguments, the Guardian ad Litem spoke, acknowledging that Father had been irresponsible, but expressing her belief that the statutory grounds for termination had not been proved. The court nonetheless ruled from the bench that there was clear and convincing evidence that Father had abandoned his child under two of the statutory definitions of abandonment: under Tenn. Code Ann. § 36-1-102(1)(A)(iii) for willfully failing to make payments towards the support of the mother during the four months immediately preceding the birth of the child,[3] and under Tenn. Code Ann. § 36-1-102(1)(A)(iv) for engaging in conduct prior to incarceration that showed a wanton disregard for the welfare of the child.

After that ruling, testimony resumed on the question of the best interest of the child. Father returned to the stand, where he testified that while in the penitentiary he completed alcohol and drug seminars and anger classes, and that he had earned his G.E.D. He stated that a barber at the penitentiary was teaching him to cut hair, that he was up for parole in 2011, and that when he gets out he plans on going back to school and getting a barber's license.

Asked about the conduct that led him to the penitentiary, Father stated that "I messed up," and that "I was young and stupid." He said that he wanted to be a good father, a good son, and a good citizen. Father acknowledged that Stepfather is a good man and a good parent, and that he understands that Dylan loves Stepfather. He stated that "I'm glad Dylan has somebody like him in his life." But he declared that he also loved Dylan and that he did not see any harm in the child having two father figures in his life.

When Stepfather took the stand, he testified about the bond between himself and his stepson. He described activities such as taking the boy fishing, playing catch with him, and coaching his baseball team. He said that he has always provided financial support to the child. Not only necessities, but things like toys and game systems. Although Dylan calls him "Dad," Stepfather testified that he never instructed him to use that term, and that he would not mind if Dylan chose to call him by his first name. He also said that Dylan's friends did not realize that he was a stepfather, that they simply thought of him as Dylan's father, and that "people at my work don't know him as anything other than my son."

---

[3]Although the court did declare that there was clear and convincing evidence that Father did not provide support to Mother in the four months preceding the birth of the child, it also expressed doubt as to whether that non-support constituted a valid ground for termination in light of the passage of time and the lack of evidence as to Father's earning capacity. The court stated that it wanted to articulate its concerns as to that ground on the record, and it concluded that "I will leave that to your argument before the Court of Appeal if that becomes necessary."

Dylan returned to the judge's chambers for further testimony, and he confirmed Stepfather's testimony as to their relationship and activities. Dylan was then asked who he would prefer to be his father if he had to choose. Dylan said he would choose Stepfather: "I want a dad that's never been in jail and never did anything wrong." He also said he wanted to use Stepfather's last name. But he testified that he would feel "kind of bad" if he couldn't see Father again, that he loved both men, that he can forgive Father, and that he never heard anybody say bad things about him. Dylan also testified in response to further questions that he never saw Father drinking beer during visitation, and that Father always used a seat belt when Dylan was in the car with him.

After closing arguments, the Guardian ad Litem stated that Stepfather was an excellent role model for Dylan, but that Father had shown that he could learn from his mistakes. She noted that if this had been a case involving the Department of Children's Services, Father would have been entitled to all kinds professional assistance following the filing of the petition for termination, in order to help him maintain or restore his relationship with the child. She accordingly asked the court to allow Father to stay in Dylan's life.

The court again ruled from the bench. The court noted that although Father had testified as to his completion of anger management and alcohol and drug abuse seminars, "I don't have a single completion certificate in the record." The court then went on to analyze the best interest of the child in accordance with the factors set out in Tenn. Code Ann. § 36-1-113(h)(2)(C)(i), and stated that in light of those factors, there was clear and convincing evidence that it was in the best interest of the child that Father's parental rights be terminated.

The court's ruling was memorialized in an order entered May 5, 2010. Father subsequently filed a timely motion to enter late-filed exhibits and to alter or amend the court's judgment. He explained in his motion that when he was transported from prison to the trial, the guard instructed him to leave all his property in his cell because he would be returning. As a result, he came to court without documentation of the programs that he completed while in prison.

Father contended that the court adversely relied on the lack of verification of his testimony as to his courses. He attached to his motion four signed and dated certificates documenting completion of courses on anger management and building social networks, a thirty-four hour course on parenting, and a course called "Unlock Your Thinking - Open Your Mind." He also attached an official transcript of GED test results, showing that Father passed all five parts of the test with scores well above average.

The court granted Father's motion to enter late-filed exhibits, but denied his motion

-6-

to alter or amend, stating that "[t]he Court stands on its original order to terminate the Respondent's parental rights even after taking the Certificates of Completion and GED transcript into consideration." This appeal followed.

### III. THE STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007), *cert. den.*, 168 L.Ed.2d 729 (2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer,* 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004).

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent and of the child; the parent shall have no right thereafter to have any relationship, legal or otherwise, with the child. Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, (1996). *See also In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases than in most civil cases. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Accordingly, appeal of an order terminating parental rights involves two separate standards of review, which require the reviewing courts to distinguish between the specific facts found by the trial court and the combined weight of those facts. *In re R.M.S.*, 223 S.W.3d 240, 264 (Tenn. Ct. App. 2006); *In re Audrey S.*, 182 S.W.3d 838, 861 fn. 26 (Tenn. Ct. App. 2005). This court must first examine the facts found by the trial court, presuming that they are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Then, the court must determine whether the facts, either as found by the trial court or as

supported by a preponderance of the evidence, clearly and convincingly establish all the elements required to terminate a biological parent's parental rights. *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007); *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006).

## IV. FATHER'S CONDUCT PRIOR TO THE CHILD'S BIRTH

Father does not deny that he failed to make payments of support to Mother when she was pregnant with his child. However, such a failure does not constitute a valid ground to terminate a parent's rights unless it is found to be "willful." *See In re Swanson*, 2 S.W.3d 180 (Tenn. 1999); *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005). *Menard v. Meeks,* 29 S.W.3d 870, 874 (Tenn. Ct. App. 2000). In *Swanson*, our Supreme Court ruled that a statutory provision which attempted to remove the requirement of intent from the definition of abandonment by reason of failure to support was unconstitutional, because it precluded the kind of individualized decision-making that is required when a fundamental constitutional right is at stake. *In re Swanson*, 2 S.W.3d at 188. *See also Menard v. Meeks,* 29 S.W.3d at 874.

A finding of willfulness is thus an essential element in any determination of abandonment. This court has stated that "[f]ailure to support a child is 'willful' when a person is aware of his or her duty of support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing support." *In re M.L.D.*, 182 S.W.3d at 896. A parent who fails to support a child because he or she is financially unable to do so is not willingly failing to support the child. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). Although the cases we have cited all involve failure to support a child who has been born, we see no reason why the same principle would not apply to failure to support the mother before the birth of the child.

In the present case, no evidence was presented that Father, who was fifteen years old when Mother became pregnant with his child, knew that he was the father, was aware of his duty to provide support,[4] or had the ability to provide any degree of support. Further, the events that followed in the almost nine years between the Dylan's birth and the filing of the petition for termination of Father's rights make the definition of abandonment found at Tenn. Code Ann. § 36-1-102(1)(A)(iii) inapplicable at the time of the petition.

---

[4]Tenn. Code Ann. § 36-1-102(1)(H) states that "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Obviously, this statutory presumption did not apply to the father in this case.

In the interim, Father petitioned the court to recognize his paternity, and he began paying child support, which continued, with some lapses, until he began serving his sentence. This course of events precludes a finding that Father abandoned his child by failing to pay support in the four months prior to his birth. Any objection to Father obtaining parental rights based on his failure to support Mother during her pregnancy should have been raised during the paternity proceeding. Because Father was granted the parental rights that accompany paternity after, and perhaps in spite of, his failure to support Mother prior to the child's birth, that failure cannot be used nine years later to deprive Father of those same rights.

## V. WANTON DISREGARD

Tennessee Code Annotated § 36-1-102(1)(A)(iv) sets out two definitions of abandonment that only apply when "[a] parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child." The first is if the parent has failed to pay child support in the four months immediately prior to his or her incarceration. The trial court recognized that that definition did not apply in this case, because the proof showed that Father did pay child support in the applicable four month period.

The second definition is if "the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Our courts have held that a finding of wanton disregard need not be based on conduct occurring during any particular time period. *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005). It "reflects the common-sense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child . . . . A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* at 866. However, incarceration alone is not a ground for termination of parental rights. *Id.*

> Rather, the parent's incarceration serves as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a substantial risk to the welfare of the child.

*Id.*

During closing arguments on grounds, Stepfather's attorney recited the facts that he believed supported the ground of wanton disregard, including Father's sometimes sporadic payment of child support, his habit of going out at night during periods of visitation with Dylan, his admitted use of alcohol and marijuana, and his criminal history.[5]

Stepfather's attorney also cited two unpublished cases to the court to support his contention that Father had shown wanton disregard for the welfare of his child. Referring to *In re C.A.H. and K.M.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953 (Tenn. Ct. App. Dec. 23, 2009) (Tenn. R. App. P. 11 app. denied March 12, 2010), he stated that it "was a case involving a very similar set of facts that we have here today. . . ." The children in that case were removed from the father's home after he was arrested on two counts of selling methamphetamine and theft. The father was later convicted of violation of probation by criminal trespass and was incarcerated again.

After he was released, the father was again arrested on two counts of selling methamphetamine. Further, "[t]he trial court found that when he was not incarcerated, Father was both using and selling methamphetamine during the majority of the periods of visitation with his children." *In re C.A.H.,* 2009 WL 5064953 at *14. The trial court found that the father in that case was guilty of wanton disregard for the welfare of his children, and this court affirmed, holding that "the trial court's findings of fact had to be presumed correct, unless the evidence preponderated otherwise." 2009 WL 5064953 at *15.

It is well known that the use of methamphetamine is not only dangerous to the health of the user, but also to the health of all those in whose presence it is used. In the case before us, although Father was convicted of possession of marijuana with intent to sell and he also admitted that he had a problem with alcohol, there was no absolutely no evidence that Father had ever used marijuana in the presence of the son, and no suggestion that he had ever done so was even raised. The child himself testified that he never saw Father drinking beer during visitation.

Stepfather's attorney also directed the trial court's attention to the case of *In re O.J.B.*, W2009-00782-COA-R3-PT, 2009 WL 3570901 (Tenn. Ct. App. Nov. 2, 2009) (no Tenn. R. App. P. 11 application filed). Both the mother and father in that case were addicted to crack cocaine, and the child tested positive for cocaine at birth. The mother admitted that she used cocaine three to four times per week throughout her eight-month pregnancy. The mother was

---

[5]The attorney then declared, "Not only that, but the weekend he had Dylan, he has a wreck and nearly kills two people and has cocaine in his system, has alcohol in his system, has barbiturates in his system, benzodiazepines in his system." However, there is no evidence in the record of this case as to Father's use of any of these illegal or controlled substances, on the night in question, or on any other night.

-10-

also incarcerated for the first three years of her child's life as a result of her stealing credit cards to finance her drug habit. The trial court found that the mother had shown wanton disregard for the welfare of her child, primarily because of her cocaine use prior to the child's birth.

The conduct of the respondents in *C.A.H.* and in *O.J.B.* was far more egregious than the conduct of Father in the present case. While we in no way condone the conduct which led to Father's incarceration, we are mindful of the higher standard of proof that is required before a party may be deprived of the constitutional right to be a parent to his or her child. We are also aware that despite the regrettable lapses in his behavior, Father has shown a great deal of care and concern for his son, and he has made a genuine effort to establish a meaningful relationship with him. After thoroughly examining the record, we have concluded that the facts found in that record do not clearly and convincingly prove that Father has shown wanton disregard for his child's welfare. We accordingly reverse the trial court.

## VI. BEST INTEREST

Since we have held that grounds for termination have not been established, we need not address the question of best interest. *See In re D.L.B.,* 118 S.W.3d 360, 368 (Tenn. 2003); *In re Valentine*, 79 S.W.3d at 550. By reversing the termination of Father's parental rights, we are not suggesting that any alteration in the current custodial or parenting arrangement is necessary. We are convinced that Stepfather will continue to be an important part of Dylan's life, providing him care, stability, and guidance, as he has done throughout his relationship with Mother.

## VII.

The judgment of the trial court is reversed. We remand this case to the Chancery Court of Marshall County for any further proceedings necessary. Tax the costs on appeal to the appellees.

_____
PATRICIA J. COTTRELL, JUDGE