IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 26, 2012

IN THE MATTER OF **CHEYENNE E. H.** AND **ROBERT L. H.**[1]

**Appeal from the Chancery Court for Lawrence County**
No. 1545011     Stella Hargrove, Chancellor

No. M2012-01657-COA-R3-PT - Filed March 7, 2013

Mother's parental rights to two children were terminated on the grounds of abandonment by failure to support, substantial non-compliance with permanency plans, and persistence of conditions. The court also concluded that termination of Mother's rights was in the best interests of the children. Mother appeals, contending that the evidence does not support the statutory grounds or that termination is in the children's best interest and asserting that the Department of Children's Services did not make reasonable efforts to reunify the family. We affirm the judgment terminating her rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Stacie Odeneal, Lawrenceburg, Tennessee, for the appellant, Doloria H.

Robert E. Cooper, Jr., Attorney General and Reporter; and Marcie E. Greene, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I. History of the case**

This case involves the termination of the parental rights of Doloria H. ("Mother") to her children, Cheyenne E. H., born January 6, 2009, and Robert L. H., born October 1, 2010. Roman H. is the father of Cheyenne and surrendered his parental rights to her on October 4,

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

2011.  Robert W. is the father of Robert and surrendered his parental rights to him on April 17, 2012.

On April 23, 2010 the Department of Children's Services ("DCS") received information from two of Mother's acquaintances that Mother was homeless and unemployed and had asked them to care for Cheyenne so that, due to Mother's previous involvement with DCS,[2] she would not lose Cheyenne to foster care.  Cheyenne had resided with the acquaintances since February of 2010; since leaving Cheyenne, Mother had not visited, had not paid support, and had not provided any other means to care for Cheyenne.  DCS filed a petition in the Lawrence County Juvenile Court on May 11, 2010, asserting that Cheyenne was dependent and neglected within the meaning of Tenn. Code Ann. § 37-1-102(b)(12)(B), (F), and (G), seeking an order that the acquaintances be granted custody of her.  The court entered an order that day placing Cheyenne in the temporary custody of the acquaintances pending a further hearing on May 19; the court also appointed a Guardian ad Litem for Cheyenne.  At the May 19 hearing, Cheyenne was placed in the custody of her paternal aunt, Ms. W.

On June 14, 2010 a permanency plan was developed for Cheyenne; the permanency goals in this plan were return to Mother and adoption.  The plan set forth the following requirements for Mother: provide safe, stable and drug-free housing; resolve all legal matters and not incur new charges; ensure that no illegal activities or domestic violence takes place in the home; not allow Cheyenne to come into contact with anyone involved in illegal activities; complete anger management classes; complete a parenting assessment and follow recommendations; continue individual counseling; sign a release so that the DCS could track her progress with the mental health provider; obtain and maintain a legal means of income; have adequate food in the home; and pay child support.  The expected achievement date for each requirement and the permanency goals was December 14, 2010.  The plan was ratified on September 29.

On October 14, 2010 DCS received a referral regarding "safety concerns" for Robert, who was born October 1.[3]  As a result of the referral, DCS filed a petition in the

---

[2] Mother had two older children who were placed in DCS custody due to dependency and neglect. The oldest child is now in the custody of his father, and Mother surrendered her parental rights to the next oldest child in August 2010.

[3] Tina Waits, an employee of Child Protective Services of the DCS, testified at the termination proceeding that the concerns arose out of Robert's parents' previous involvement with DCS; each parent had lost custody of other children, were unemployed and homeless and, in some manner, had been involved in situations in which domestic violence was alleged.  Ms. Waits testified that Mother had previously been

(continued...)

LawrenceCounty Juvenile Court seeking temporary legal custody of Robert on October 21. In the petition, DCS stated that, due to the circumstances of Mother and Robert's father, Robert was "subject to an immediate threat" and that DCS had placed Robert into protective custody on October 18.[4] The court entered an order granting DCS temporary custody of Robert and setting a hearing for October 27; following the October 27 hearing the court entered an order *inter alia* continuing DCS' custody of Robert and setting a further hearing for December 1.[5]

Another permanency plan was developed on November 5, 2010. This plan included Robert and maintained the goals of reunification and adoption relative to both children. The plan identified continuing concerns regarding the need of the parents to provide adequate and stable housing for the children and set out specific steps Mother was to take to secure and pay for housing. The plan provided that Mother would maintain "regular and positive" visitation with the children, that the custodians of the children would accommodate the visitation, and that DCS would monitor it; other requirements of the June 14 plan were retained.[6]

Another plan was developed on May 27, 2011 and ratified on October 17. This plan continued the concerns and requirements of the previous plans and retained the permanency goals; the plan added the requirements that Mother submit to random drug tests and show proof of stability to DCS through receipts for housing or utility payments. Mother filed an objection to the plan, specifically identifying the following provisions with respect to both children: supervised visitation, the "overbroad statement" that Mother would parent the children appropriately, and the goal of adoption.[7]

---

[3](...continued)
indicated for nutritional neglect, environmental neglect, lack of supervision, and physical abuse relative to two of her other children and that, at the time of Robert's birth, Mother was living with her father, who had been "indicated" for sexual abuse of children in 2004.

[4] Ms. Waits and Mr. D, the adoptive parent of Robert's half-sister, testified at the termination hearing that Robert was placed with Mr. D and his wife on October 18, 2010.

[5] The technical record contains an order entered December 1, 2010 continuing the matter to February 2, 2011 to complete genetic testing of the parties; there is no order in the record relative to the February 2, 2011 hearing. An adjudicatory hearing was held on March 30, 2011, as a result of which the court entered an order declaring Robert to be dependent and continuing his custody with DCS.

[6] The record does not show when this plan was ratified by the court.

[7] With respect to Cheyenne, Mother also objected to the "current placement of the child" and noted in the objection relative to Robert that "[t]his court found, based on DNA evidence, that [Robert W.] is the biological, and now legal father of the minor child." The record does not show what, if any, action was taken

(continued...)

Another permanency plan was apparently adopted on November 14, 2011, which added the requirement that Mother provide diapers, food, and clothing for the children during visits and attend all medical appointments; the other provisions of the prior plans were continued.[8]

The last permanency plan in the record is dated March 13, 2012; this plan likewise incorporated the action steps contained in the previous plans.[9]

On July 25, 2011, DCS filed a petition with the Chancery Court of Lawrence County to terminate Mother's parental rights to Cheyenne and Robert on the grounds of abandonment by failure to support, substantial noncompliance with the permanency plans, and persistence of conditions. A trial was held on June 13 and 14, 2012 and on July 5 the court entered an order terminating the parental rights of Mother on the grounds asserted in the petition; the court also found that termination of Mother's parental rights was in the best interest of the children.

Mother appeals, articulating the following issues:

> I. Whether clear and convincing evidence supports the trial court's decision to terminate Appellant's parental rights on the statutory grounds of abandonment by willful failure to support, or to make reasonable efforts to support the children.
> II. Whether clear and convincing evidence supports the trial court's decision to terminate Appellant's parental rights on the statutory ground of substantial non-compliance with permanency plans.
> III. Whether clear and convincing evidence supports the trial court's decision to terminate Appellant's parental rights on the statutory ground of persistence of conditions.
> IV. Whether clear and convincing evidence supports the trial court's determination that the termination of the Appellant's parental rights was in the children's best interest.
> V. Whether the Department made reasonable efforts to reunify the family.

---

[7](...continued)
relative to the objections.

[8] The plan that is in the record is not signed and does not show that it was ratified; we have not been cited to any testimony where the November 2011 plan was discussed.

[9] The plan in the record does not show that it was ratified.

## II. Standard of Review

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statues identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (citing Tenn. Code Ann. § 36-1-113(g)). A party seeking to terminate the parental rights of a biological parent must prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 366-67 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Secondly, the party must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky v. Kramer*, 455 U.S. 745, 766-69 (1982); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## III. Discussion

### A. Abandonment by Failure to Support

Tenn. Code Ann. § 36-1-113(g)(1) designates "abandonment," as defined in Tenn. Code Ann. § 36-1-102, as a ground for terminating parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i) defines "abandonment" in part pertinent to this issue as follows:

> For a period of four (4) consecutive months immediately preceding the filing
> of a proceeding or pleading to terminate the parental rights of the parent(s) or

guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) . . . have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

*Id.* A finding of willfulness is an essential element in any determination of abandonment; a failure to support does not constitute a valid ground to terminate a parent's rights unless it is found to be "willful." *See In re Swanson*, 2 S.W.3d 180 (Tenn. 1999); *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005). *Menard v. Meeks*, 29 S.W.3d 870, 874 (Tenn. Ct. App. 2000). This court has stated that "[f]ailure to support a child is 'willful' when a person is aware of his or her duty of support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing support." *In re M.L.D.*, 182 S.W.3d at 896.

In the July 5, 2012 order terminating Mother's parental rights, the trial court held as follows relative to ground of abandonment:

> Clearly, Respondent was aware of the duty to pay child support. The Petition for termination was filed July 25, 2011. Trial Exhibit No. 44 and No. 45 are each an Order of Juvenile Court based upon a child support hearing on behalf of the children on March 16, 2011, setting child support to be paid by Respondent at $195.50 per month for each child. Respondent signed and approved each Order. She paid $20 ($10 for each child) prior to the filing of the Petition for termination. This was paid on June 6, 2011 (Trial Exhibit Nos. 47 & 48). There is a notation on one of the child support Orders stating that Petitioner was currently not employed. She testified at the termination hearing that subsequent to the birth of Robert she worked odds and ends jobs earning some $100 to $200 per month. Mr. Moling testified that he "hired" Respondent in April, 2011, and paid her $100 cash each week. The Court finds that Respondent was capable of paying more than $20, and made no effort to do so. Further, the Court finds that Respondent has no justifiable excuse for the failure to pay no more than token support for these two children.
>                         * * *
> The Court finds that Petitioner has carried its burden of proof that Petitioner has abandoned the children by willfully failing to support or to make reasonable efforts to support the children for four months immediately preceding July 25, 2011.

Mother contends that the evidence does not support the finding that she willfully failed to support her children.

Each permanency plan included the requirement that the parents pay child support. Additionally, the Juvenile Court of Lawrence County filed separate orders on March 18, 2011, requiring child support for Cheyenne and Robert. Evidence shows that the only support payments Mother made were $10.00 for each child in June 2011 and again in September 2011. As noted by the trial court, the testimony and evidence showed that Mother moved to Alabama in April 2011 to begin a job as secretary at a small business. Her compensation was $100.00 per week,[10] along with non-cash allowances for housing (at $400 per month), utilities ($308 per month) and fuel ($200 per month).

The evidence shows that in the four months preceding the filing of the petition, Mother was aware of her duty to support both children and that she was employed earning a salary. The evidence also shows that she paid a total of $20 in support in the four months prior to the filing of the petition and $20 between the filing of the petition and the hearing date; she offered no justifiable excuse. The evidence clearly and convincingly suppports the termination of her parental rights in accordance with Tenn. Code Ann. § 36-1-113(g)(1).

### B. Substantial Non-Compliance with Permanency Plans

Tennessee Code Annotated § 36-1-113(g)(2) authorizes termination of parental rights for failure to comply with a permanency plan as follows:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed *de novo* with no presumption of correctness. *Id*. at 546. In order to terminate a parent's rights on the ground of substantial noncompliance, the court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valantine,* 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). Further, to justify the termination of parental rights, the noncompliance must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008) (no Tenn. R. App. P.11 application filed).

Mother acknowledges that the children came into DCS custody "because of unstable housing and income, and [Mother's] previous involvement with the Department"; she does not contend that the requirements of any of the permanency plans were not related to

---

[10] Mother's employer testified that he usually paid Mother in cash.

addressing the conditions. She contends that Mother obtained stable housing and income, thereby substantially completing requirements of the plan and that she complied in varying degrees with other requirements. We respectfully disagree.

The permanency plans required that she complete a parenting assessment and follow the recommendations. The record shows that Mother attended a program operated by the Child Advocacy Center in Guntersville, Alabama, over a period lasting from July 5, 2011 to May 16, 2012. The report from the Parent Educator at the program Mother attended noted that the program was a fifteen week program designed to be attended on a "building consecutive scale"; that, because of the nature of the program, classes had to be started over if three classes were missed in order that material not be lost or need repeating; that Mother attended only six classes through the end of 2011, necessitating her restarting the program; and that Mother's "inconsistency of attendance and her actions" were "concerning".[11]

With respect to the requirement that Mother attend anger management classes, Alexandria Coleman, the DCS Family Service Worker, testified that the anger management classes were available through the Child Advocacy Center but that Mother failed to attend. She testified that Mother first stated that Mother could not afford the classes; upon further inquiry, however, Ms. Coleman determined that the classes were free prior to 2012.

With respect to the requirement that she receive mental health services, Mother testified that she received those services seven times through LifeCare in Lawrenceburg, Tennessee, beginning in January 2010 and ending in March 2011 due to loss of insurance and that she received services from Mountain Lake Behavioral in Alabama beginning in the summer of 2011 until "about the end of November." Ms. Coleman testified that Mother saw a therapist at LifeCare "seven or eight times" over the fourteen month period, with another "15 or so" appointments either cancelled or which Mother failed to attend. Ms. Coleman was unable to confirm Mother's receipt of mental health services at Mountain Lake because Mother failed to provide a release for DCS to receive her mental health records.[12]

As noted previously, at the time of trial Mother had been employed in Alabama since April 2011; part of her compensation included housing. A letter dated April 16, 2012, from the Marshall County, Alabama, Department of Human Resources reported on an ICPC[13]

---

[11] Mother had not completed the program by the time of trial.

[12] Providing DCS with a release to allow access to her mental health records was also a requirement of the permanency plans.

[13] The Interstate Compact Placement of Children allows for an agency in one state to perform a home
(continued...)

home evaluation conducted by that agency and was unable to approve Mother's home "due to the home being under renovations and it was a safety hazard." Mother testified that her father, with whom she had lived in Tennessee and who had been who had been "indicated" by DCS for child abuse in 2004, lived at her home in Alabama on weekends and one day per week; Ms. Coleman testified that because Mother's father lived with her, placing the children into the home in Alabama would not have been approved even if there were no safety hazards.

With respect to the requirement that she maintain employment and pay support, Mother testified that she held various jobs between the time that Robert was born in October 2010 and April 2011, averaging about $100 or $200 per month and that, beginning in April 2011, she earned $400 per month. As noted earlier, the record shows she paid a total of $40 in child support during the two years spanning the creation of the first permanency plan and the time of trial.

Other evidence showed that, despite the requirement that Mother resolve all legal matters and not incur new charges, the record shows that, as of the time of trial, Mother had not paid the court costs incurred relative to a domestic assault incident of October 2010, for which she was indicted in April of 2011. A letter dated April 5, 2011 from the Director of The Shelter, Inc., which provides domestic violence classes in Lawrenceburg, states that Mother attended 11 domestic violence classes since November 2010 but that the Director "can't see improvement at this time because she dwells too much on the abuser instead of herself."

Viewing the record in its entirety, it is clear that Mother made, at best, token efforts to comply with the permanency plan requirements in the two years that the plans were in effect. The evidence clearly and convincingly supports the trial court's holding that Mother failed to substantially comply with the requirement of the permanency plans.

## C. Persistence of Conditions

Parental rights may be terminated on the basis of "persistence of conditions" as defined by Tenn. Code Ann. § 36-1-113(g)(3)(A) when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

---

[13](...continued)
study on a parent or home for an agency in another state. The Alabama agency was performing the evaluation at the request of DCS.

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

A termination proceeding based on the persistence of conditions ground requires a finding by clear and convincing evidence of all three statutory factors. *In re Valentine*, 79 S.W.3d at 549.

In its order of July 5, 2012 the trial court recounted the circumstances regarding the removal of the children and held:

The Court finds that Respondent has continued to have unstable housing. She is totally dependent on Mr. M[ ] for her existence. She continues to be charged with domestic violence. She has never followed up on services offered by Petitioner, services which the Court finds would greatly assist Respondent in providing for and caring for her children. It appears to the court that Respondent does not want to live in a stable home with her children, such as the [ ] home; she prefers to take up with a stranger whom she met through the internet and to become totally dependent on him.

The evidence shows that in the two years that the children had been removed from Mother's custody she failed to remedy the conditions which led to their removal. The permanency plans identified specific areas of concern relative to the conditions and DCS offered Mother assistance to receive services which would address those conditions; significantly, the services would have improved Mother's ability to provide for herself. As a result of Mother's failure to do what was required under the permanency plans, her situation did not change and showed no realistic prospect that it would change. Cheyenne and Robert are being raised in safe and stable environments and Mother's failure to progress will delay their achieving permanency in their current situations.

**D.     Best Interests**

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard.   The legislature has set out a list of factors at Tenn. Code Ann. § 36-1-113(i) for the courts to follow in determining the child's best interest.[14]  The list of factors in the statute is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest.  *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

In determining that termination of Mother's parental rights was in the best interest of the children, the court focused on Tenn. Code Ann. § 36-1-113(i) (1), (3), (4), (5) and (7) and

---

[14] The factors at Tenn. Code Ann. § 36-1-113(i) are:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

made findings with respect to each. The record does not preponderate against the court's findings and we agree that termination of Mother's parental rights is in the best interest of the children.

### E. Reasonable Efforts

Mother contends that DCS failed to provide reasonable efforts to reunify the family and that "the Department's failure to make a reasonable effort was a significant factor in enabling the Department to argue [Mother] abandoned her children."

Reasonable efforts are defined as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The factors the courts are to use to determine reasonableness include:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B*., 228 S.W.3d at 158-59 (citing *In re Giorgianna H*., 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)) (footnote omitted). The reasonableness of the Department's efforts depends upon the circumstances of the particular case. *In re Giorgianna H*., 205 S.W.3d at 519.

Contrary to Mother's assertion, the record shows that the efforts of DCS in addressing the situation by which the children were brought into its custody were reasonable and designed to assist Mother in getting into a position whereby she could be reunited with her children. The DCS employees testified to the assistance offered Mother beginning with Cheyenne's removal, through Mother's pregnancy with Robert, and to the time of trial. DCS' efforts spanned two years and two states and often were met with indifference on Mother's part. Other testimony noted Mother's lack of diligence and participation in services which would help her remedy the conditions which led to the children's removal. Mother's contention is without merit.

## IV. Conclusion

For the foregoing reasons, the judgment terminating Mother's parental rights is affirmed.

_____
RICHARD H. DINKINS, JUDGE