IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 7, 2010 Session

**IN THE MATTER OF: JALEIA M. R.**

**Appeal from the Chancery Court for Lawrence County**
**No. 14039-08      Jim T. Hamilton, Judge**

**No. M2010-00761-COA-R3-PT - Filed March 29, 2011**

The trial court terminated the parental rights of both parents of a four year old girl on the ground of abandonment.  The court also found that an additional ground that applied to the father was his failure to legitimate the child, and an additional ground that applied to the mother was her failure to remedy the conditions which led her to lose custody of the child, with little likelihood that those conditions would be remedied in the immediate future.  Only the mother appealed.  We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Tiffany M. Johns, Nashville, Tennessee, for the appellant, M. R.

Michael Wallace Coleman, Jr., Lawrenceburg, Tennessee, for the appellees, C. W. and H. W.

**OPINION**

**I. BACKGROUND**

The child at the center of this case, Jaleia M.R., was born on February 6, 2006 to M.R. ("Mother").  Although Mother was married at the time, her husband was not the child's biological father.  When the child was three months old, Mother asked C.W. and H.W., a married couple that she had known for a long time, to help her take care of the child.  The couple agreed, and they starting taking care of Jaleia one or two days a week, increasing over time to about three days and two nights each week.  C.W. and H.W. are members of a church that has given much help to Mother and to members of her family over the years.  H.W. is

the youth pastor and music pastor of the church, and her father is its long-time pastor. C.W. works for a private company in a job he has held for seven years.

In February 2007, Mother was facing the possibility of a long incarceration as the result of a probation violation.[1] She made arrangements for her own mother to care for her two older children, and she asked C.W. and H.W. to assume temporary custody of Jaleia. The couple drafted an "Agreed Order of Temporary Custody" and submitted it to the Juvenile Court of Lawrence County. The order recited that "[C.W. and H.W.] are stable members of the community who have assisted the Mother with the care of Jaleia in the past," and that they "are willing to care for the child during the Mother's incarceration and while she gets back on her feet." The order further stipulated that the mother "will have frequent and reasonable visitation as she and [C.W. and H.W.] shall from time to time agree." The Agreed Order was signed by Mother and by the judge and was filed on February 20, 2007, shortly after Jaleia's first birthday.

As it happened, Mother only had to serve three weeks in jail for her probation violation, which was followed by three weeks of rehabilitation. After she was released, C.W. and H.W. let her come and see Jaliea whenever she wanted and let her take the child for visitation as well. In May of 2007, about ninety days after the Agreed Order for Temporary Custody was entered, Mother went to see the attorney for C.W. and H.W. According to Mother, she asked him how to reverse the temporary order, and she gave him one hundred dollars to draft a motion to do so, but the Juvenile Court Judge declined to reverse the order. According to the attorney, Mother told him that C.W. and H.W. had agreed to reverse the order, and when he learned that this was not the case, he did not submit the motion. In any case, the order was not reversed, and the attorney returned Mother's money. Custody of Jaleia remained with C.W. and H.W., and Mother's visitation continued as before.

This situation remained essentially unchanged until July of 2008, when Mother suffered a drug overdose. Mother's attorney suggested at oral argument that the overdose was accidental, but Mother admitted at trial that it was actually an attempted suicide. H.W. also testified that she had read a suicide note that Mother had written to Jaleia.[2] The relationship between the couple and Mother became strained after Mother's suicide attempt. C.W. and H.W. still allowed Mother to come into their home, however, and to see the child

---

[1]The proof showed that Mother was on probation as the result of a conviction for TennCare fraud when she was arrested for the sale of cocaine. She pled guilty to the cocaine charge and was sentenced to eight years and to payment of a fine. Rather than having to serve her sentence, she was placed on probation. Mother also had a burglary charge pending against her in the State of Alabama, dating from 2004.

[2]The purported suicide note was not introduced into evidence and is not a part of the appellate record.

anytime she wanted.

C.W. and H.W. suspected that Jaleia's biological father was T.W.B., a man that had known C.W. for fifteen or sixteen years. They asked him to take a DNA test, and he agreed. The test was performed on July 31, 2008, and it revealed that T.W.B. was indeed Jaleia's biological father. T.W.B. has seven children in all, six of whom were in the custody of the Department of Children's Services at the time of the trial in this case. According to Mother's attorney, T.W.B. agreed to voluntarily terminate his parental rights to Jaleia on August 18, 2008. However, Father changed his mind and revoked his agreement on August 26, 2008.[3]

## II. A PETITION TO TERMINATE PARENTAL RIGHTS

On August 26, 2008, the same date that T.W.B. revoked his agreement to allow his parental rights to be terminated, H.W. and C.W. filed a petition in the Chancery Court of Lawrence County to terminate the parental rights of both Mother and T.W.B. and to adopt Jaleia. The petition alleged that Mother and T.W.B. had both abandoned Jaleia by failing to visit and/or support the child in the four months preceding the filing of the termination petition. *See* Tenn. Code Ann. § 36-1-113(g)(1). As a further ground, they contended that T.W.B. had failed to pay the reasonable birth or prenatal expenses of the child or mother, and that he had not filed a petition to legitimate the child. Tenn. Code Ann. § 36-1-113(g)(9)(A)(i) and (vi). Finally, they alleged that "the conditions which led to Jaleia being placed in the custody of the Petitioners have not been remedied by the Respondents and will not likely be remedied in the immediate future." Tenn. Code Ann. § 36-1-113(g)(3).

Mother filed an answer to the petition and a motion for visitation on November 19, 2008.[4] The trial court filed an agreed order of pendente lite visitation on December 2, 2008. The order stated that Mother was allowed to have visitation with Jaleia from Friday at 6:00 p.m. until Saturday at 8:00 p.m. each week, with the overnight visitation to be exercised at the home of the maternal grandmother. Overnight visitation at the Mother's home was prohibited. The court subsequently appointed a Guardian ad Litem for the child, and an attorney for T.W.B.

---

[3]The orders relating to Father's purported voluntary termination of his parental rights are not part of the record on appeal.

[4]Although we have characterized Mother's motion as a motion for visitation, it was actually titled "Notice and Motion for Pendente Lite Support," and was directed to D.W., H.W. and to T.W.B. However, the motion simply stated that Mother's attorney would move the court on December 2, 2008 for child custody and/or child visitation pendente lite.

The trial on the petition to terminate was conducted on December 8, 2009. When C.W. and H.W. were called to the stand, they testified that they and their church provided aid to Mother and to members of her family in the past, even before Jaleia was born. They stated that they have no other children and that they have come to love Jaleia. They have supported Jaleia fully ever since she came into their custody, and they have never asked Mother for support. Although they have never insisted that she do so, they testified that Jaleia calls C.W. "daddy" and H.W. "mommy."

C.W. and H.W. also testified that they have always made Jaleia available to Mother, but that they believe it is in the child's best interest to allow them to adopt her. H.W. testified that Jaleia sometimes cries when Mother comes to pick her up for visitation, and that she tells H.W., "Mommy, I don't want to go." H.W.'s mother also testified that she has seen Jaleia cry when it is time for Mother to pick her up, and that the child asks, "Why? Why do I have to go?" but that H.W. calms her down and tells her that it is necessary. Another witness, a neighbor of C.W. and H.W., testified that she had seen the child wrapping her arms and legs around H.W., screaming that she does not want to go, until Mother has pried her out of H.W.'s arms.

When Mother took the stand, she testified that Jaleia always enjoyed coming to her home and playing with her siblings, and that she sometimes cried when she had to return to C.W. and H.W.'s care. Mother admitted that she had never paid child support to C.W. and H.W., but she stated that "I've offered. They've denied." Mother's testimony also showed that she gave birth to another child after Jaleia was born, leaving her with four children by four different men. Her oldest child became pregnant at age fourteen and gave birth in 2009, making Mother a grandmother at the age of twenty-eight. Mother acknowledged that she frequently changed residences after Jaleia was born, moving back and forth between various apartments and houses, and then moving back in with her mother. She is currently living in a two bedroom apartment with her mother, three of her children and her young grandson.

Mother also admitted that she had been in relationships in recent years with two men who were convicted felons. She testified that she lived with one of them from February 2007 until October 2007, but that they broke up because she found out he was using cocaine. She dated another for several months. She claimed, however, that she had decided to avoid such relationships in the future, to change her life, and to set a good example for her children. She testified that because of her drug overdose, she no longer takes any drugs other than Phentermine, a drug prescribed by her doctor for weight loss. She also goes to counseling to help her deal with the recent deaths of her sister and her father and with the uncertainties surrounding her relationship with Jaleia.

-4-

Mother testified that she is currently working at two jobs: a part-time job at a video store in Lawrenceburg, and a full-time job as a long-distance sales "rep"for a company in Columbia. She testified that she has been working at the video store for two and a half years, and that she began the sales job in May of 2009. She is paid minimum wage at the video store, and she only works there every other weekend, averaging five hours a week. The other job pays eight dollars an hour plus commission, and Mother estimates that "I bring home anywhere from thirteen to twenty-five dollars an hour." Mother also sometimes receives child support from the fathers of two of her children.

Mother testified that while she is working in her sales job, her youngest child is in daycare. Her niece picks the child up when daycare closes, and the niece and Mother's fifteen year old daughter take care of the child in the hour between the closing of daycare and Mother's return from work. On the weekends when Mother is working at the video store, her best friend or her mother watch the children. Mother was asked what the difference was between her situation at the time C.W. and H.W. assumed custody of Jaleia and her situation at the time of trial. She responded, "well, today, I'm clean and sober. I have a job. I have my own place. I have my license back. I go to NA meetings. I go to counseling. I go to church. And, I do all of that regularly."

At the conclusion of the trial, the court asked all the parties to submit proposed findings of fact and conclusions of law for his consideration, ordering them to "get that to me as quickly as you can; and I'll do something with this case. It needs to be closed." The record only contains the findings of fact and conclusions of law which were proposed by C.W. and H.W. The trial court adopted those findings and conclusions *in toto*, and incorporated them into an order filed on March 2, 2010. The order terminated the rights of both parents on the basis of abandonment and other grounds, and on a finding that termination was in the best interest of Jaleia. Mother filed an appeal of the trial court's order.

### III. STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, and of

severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian. The parent or guardian shall have no further right to notice of proceedings for the adoption of that child by other persons and shall have no right to object to the child's adoption or thereafter to have any relationship, legal or otherwise, with the child. . . .

Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M. L. B. v. S. L. J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996), quoting *Santosky,* 455 U.S. at 787, 102 S. Ct. at 1412 (Rehnquist, J., dissenting). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.*, (quoting *Santosky*, 455 U.S., at 774, 102 S.Ct. at 1405 (Rehnquist, J., dissenting)).

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition, it must be shown that termination of parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

One of the safeguards required by the fundamental nature of a parent's constitutional rights is that courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 769, 102 S. Ct. at 1403; *In re M.W.A.*, 980 S.W.2d at 622. To justify the termination of parental rights, both the grounds for termination and the fact that termination is in the best interest of the child must be established by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622.

# IV. ABANDONMENT

As we noted above, the statutory grounds for termination of parental rights are found at Tenn. Code Ann. § 36-1-113(g). One ground is that "[a]bandonment by the parent or guardian, as set out in § 36-1-102 has occurred." Tenn. Code Ann. § 36-1-113(g)(1). Tenn. Code Ann. § 36-1-102 in turn describes several possible scenarios whereby a parent may be deemed to have abandoned his or her child, including the one alleged in the petition herein, that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102 (1)(A)(i).

The trial court in this case found by clear and convincing evidence that Mother abandoned Jaleia by willfully failing to pay any support on her behalf for a period of a least four months prior to the filing of the petition for termination of her parental rights. Mother admitted that she did not pay support for Jaleia after C.W. and H.W. assumed custody of the child, but no proof was presented that she had the ability to pay support during the relevant period.

A parent's failure to pay support for or to visit a child in the custody of another does not constitute a valid ground to terminate a parent's rights unless it is found to be "willful." *See In re Swanson*, 2 S.W.3d 180 (Tenn. 1999); *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *Menard v. Meeks,* 29 S.W.3d 870, 874 (Tenn. Ct. App. 2000). In *Swanson*, our Supreme Court ruled that a statutory provision which attempted to remove the requirement of intent from the definition of abandonment by reason of failure to support was unconstitutional, because it precluded the kind of individualized decision-making that is required when a fundamental constitutional right is at stake. *In re Swanson*, 2 S.W.3d at 188. *See also Menard v. Meeks,* 29 S.W.3d at 874.

A finding of willfulness or of intent is thus an essential element in any determination of abandonment by reason of failure to visit or failure to support. This court has stated that "[f]ailure to support a child is 'willful' when a person is aware of his or her duty of support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing support." *In re M.L.D.*, 182 S.W.3d at 896. A parent

who fails to support a child because he or she is financially unable to do so is not willingly failing to support the child. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

Mother's testimony showed that she was working at a video store during the period between April 26, 2008 and August 26, 2008 (the date the petition to terminate was filed), and that she was earning the minimum hourly wage. While she was only working there five hours per week at the time of trial, there was no testimony as to how many hours per week she was working during the relevant period for a finding of abandonment under the statute. Regardless, most of her income had to go to the needs of her large family, including the support of her remaining three children.

Further, Mother testified that she asked C.W. and H.W. many times if they needed anything such as clothes or diapers, but that H.W. always refused, saying that she and her husband had agreed to take care of Jaleia, and that they had it all covered. H.W. confirmed hat she and her husband never asked Mother for support or expected her to provide any. While occasional offers of token support do not constitute support, based on all the evidence in the record, we conclude that there was not clear and convincing evidence that Mother's failure to pay child support for Jaleia was willful within the meaning of Tenn. Code Ann. § 36-1-102(1)(A).

## V. PERSISTENCE OF CONDITIONS

The second ground for termination that the trial court held had been proved by clear and convincing evidence is sometimes called "persistence of conditions." Its exact definition is as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

This Court has held that the use of the term "further abuse or neglect" in the above statute and the historical development of that statute indicate that the ground of persistence of conditions only applies when the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse. *In re Audrey S.*, 182 S.W.3d 838, 872 (Tenn. Ct. App. 2005). In this case, the order that led to Jaleia's removal from Mother's home was filed because of the possibility that Mother would be incarcerated for a long period of time. The removal was voluntary on Mother's part, and was motivated by her desire to protect the child in the event of a long incarceration. There is no evidence that Jaleia has ever been found to be neglected or abused.

But even if, *arguendo*, we held this court's holding in *In re Audrey S.* to be inapplicable to this case, we do not believe that the proof in the record is sufficient to satisfy all the elements of Tenn. Code Ann. § 36-1-113(g)(3). We note that unlike other grounds for termination, which are based solely on a parent's conduct prior to the filing of the termination petition, evidence of conduct occurring subsequent to the filing of the petition is relevant to the question of whether the conditions that led to the removal of the child from the parents' home still persist or whether they can be remedied at an early date.

There is no doubt that Mother has made some very poor choices in her life. We are mindful that she remains on probation and that she may still have to face charges in Alabama dating from a 2004 incident. If Mother were still violating her probation by engaging in risky behavior, then the probability of future incarceration would make it difficult to conclude that the adverse conditions that led her to give up custody of her child could be remedied at an early date. However, Mother's uncontroverted testimony shows that she has made great strides towards straightening out her life. She no longer uses illegal drugs. She is working at a part-time job and a full-time job. She apparently understands the risks that her conduct posed for herself and her children, and she has sought and obtained counseling to help her with her problems.

Further, the very act of relinquishing custody of her child to responsible adults when she realized that she might not be around to care for her and that her mother was not in a position to help, shows that Mother was mindful of her parental responsibilities, despite her unwise conduct in other areas. So long as Mother is able to avoid the negative behavior she has previously shown, she should not be penalized for seeking to protect her child from the consequences of that behavior. As this court has observed,

> It frequently occurs that childless relatives welcome the opportunity of sheltering and supporting an attractive child, and consider the expense a

privilege, rather than a burden.  Such relatives are a boon to unfortunate and abandoned mothers, and their generosity is not expected to hide the trap of abandonment and ultimate loss of parent-child relationship.  If there is any such expectation, the mother is entitled to be put on notice of the peril of accepting such generosity.

*Pierce v. Bechtold,* 448 S.W.2d 425, 429-30 (Tenn. Ct. App. 1969)

C.W. and H.W. are not Jaleia's blood relatives, but it is obvious to this court that they agreed to take care of Jaleia because of their own generosity and desire to be of help.  Their testimony and conduct shows that they did not initially plan to adopt the child, but that strong ties of love and affection have, perhaps inevitably, developed between them and the child. After Mother's attempted suicide, their concerns about her fitness as a parent led them to seek to terminate her parental rights.  Those concerns are genuine, and have not been totally dispelled by the progress Mother has made in turning her life around. Nonetheless, we do not believe that there is clear and convincing evidence that the conditions that led to the child's removal still persist, that other conditions preventing the child's return to Mother have arisen, or that those conditions cannot be remedied at an early date.

Reversal of the judgment terminating Mother's parental rights does not affect physical custody of the child.  We recognize the strong ties between Jaleia and C.W. and H.W., as well as the uncertainty as to whether Mother is currently in a position to assume the child's care and custody.  Absent further orders, the Agreed Order of Temporary Custody remains in place.  We reverse the trial court's order and dismiss the petition to terminate parental rights as to Mother, and we remand this case to the trial court for any further proceedings that may be necessary.

## IV.

The judgment of the trial court is reversed as to Mother.  We remand this case to the Chancery Court of Lawrence County for further proceedings.  Tax the costs on appeal to the appellees, C.W. and H.W.

_____
PATRICIA J. COTTRELL, JUDGE