# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
October 24, 2012 Session

## IN RE: DRAKO J. M., & SKYLER B. M.

**Appeal from the Circuit Court for Sumner County**
**No. 83CC12011CV636      C. L. Rogers, Judge**

_____

**No. M2012-01404-COA-R3-PT - Filed December 18, 2012**

_____

The parents of two young children agreed to give the paternal grandparents custody of the children. The grandparents subsequently filed a petition for termination of their parental rights on the ground of abandonment, and for adoption. The father agreed to surrender his rights during the hearing on the termination petition, but the mother insisted that she had not abandoned her children. The trial court terminated the parental rights of both parents on the ground of abandonment by willful failure to pay financial support in the four months prior to the filing of the petition for termination. See Tenn. Code Ann. § 36-1-113(g)(1). Mother appealed. She acknowledges that she failed to pay support during the relevant period, but she insists that her failure was not willful. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

Patricia J. Cottrell, P.J., M.S., delivered the opinion of the Court, in which Frank G. Clement, Jr. and Richard H. Dinkins, JJ., joined.

Kathryn Amy Strong, Gallatin, Tennessee for the appellant, A. N. W. M.

Paul A. Rutherford, Wende J. Rutherford, Nashville, Tennessee, for the appellees, L. J. M. and T. L. B. M.

### OPINION

### I. A PETITION FOR TERMINATION OF PARENTAL RIGHTS

The two children at the center of this case are Drako A.M., born on November 20, 2007 and Skyler B.M., born on September 5, 2009. Their parents, D.J.M. (Father) and A.N.M. (Mother) found themselves unable to give the children the care they needed, in large part because they were abusing prescription drugs. The parents accordingly agreed to give physical custody of the children to Father's parents, the petitioners in this case, while the

children were quite young. Father's parents obtained custody of Drako on January 21, 2009, and of Skyler on June 2, 2010.

The appellate record indicates that Father's parents obtained legal custody of the children by court order. However, the order of earliest date found in the appellate record was entered in the Juvenile Court of Sumner County on January 13, 2011. It states that the parties had agreed in open court that physical custody of the children was to remain with Father's parents, and that Mother and Father were entitled to liberal visitation and to all the parental rights set out in Tenn. Code Ann. § 36-6-101, such as unimpeded telephone conversations with the children, the right to receive copies of the children's educational and medical records, and the right to be free of unwanted derogatory remarks made about them to the children or in the presence of the children.

The order also recites that a petition that had been filed by Mother's parents was dismissed and that Mother's parents were entitled to ample visitation opportunities when the children were in the physical care of the biological parents. The order was signed by the attorney for Mother and Father, the attorney for Father's parents, and by Mother's parents themselves, both of whom signed on their own behalf.

An incident that occurred ten days after the entry of the Juvenile Court order apparently influenced the decision by Father's parents to file the termination petition that is at the center of this appeal. According to Father's mother, Mother asked if she could pick Drako up for a visit on January 23, 2011, and the grandmother agreed.[1] Mother was driving a car that she had borrowed without the permission of the car's owner. Mother did not have a car seat for the child, so Father's mother gave her one. Mother took the child to a shopping mall, removed the car seat from the car, and left it on an island in the parking lot. When the owner of the car called her and asked for its return, Mother went back to the car, but could not find the car seat. She then called Father, and asked him to pick the child up and take him back to Father's parents.

In March of 2011, Father's parents, acting on reports of Mother's continuing drug abuse, including her use of inhalants, filed a petition in the Juvenile Court of Sumner County to have Mother barred from any further contact with the children. The court conducted a hearing on the petition on March 30, 2011, but Mother did not appear. The order resulting from that hearing stated that Mother had not been properly notified to appear, but it restricted her visitation to allow only supervised parenting time with Father's parents, pending a final hearing. No such supervised visitation occurred after the entry of that order and no further

---

[1]Father's mother testified that she kept a daily journal, and that was why she could be so certain about the date of the incident.

hearing was conducted. The proof later showed that Mother had been arrested on March 26, 2011 for shoplifting inhalants and for public intoxication and may have been in jail at the time of the hearing.

Father's parents filed their Petition for Termination of Parental Rights and Adoption in the Circuit Court of Sumner County on May 23, 2011, exactly four months after the incident at the mall. The only ground for termination cited in the petition was that Mother and Father had abandoned the children by willfully failing to visit or support them in the four months prior to the filing of the petition. Tenn. Code Ann. § 36-1-102(I)(A)(i). The Petition also included a request that the court appoint a Guardian ad Litem to represent the children's interests.

Mother filed a hand-written pro se answer on July 28, 2011. She contended that Father's parents had misled her about "everything involving her parental rights," that she was prepared to take care of the children and that she had been "maintaining a steady lifestyle for some time." She concluded by asserting that she would prove to the court that "the best thing for the children is to be with their birth mother as God intended." Father did not file an answer.

Mother moved the court to appoint an attorney to represent her in the termination proceeding, but she did not file a verified affidavit of indigency with her motion. The trial court denied Mother's motion, holding that she "does not meet the requirements to receive Court appointed counsel." The court conducted a hearing on Father's parents' petition on September 29, 2011. Mother did not appear at the hearing. Father did appear and he consented to the termination of his parental rights. The court heard Father's parents' proof and granted their petition, entering a Final Order of Adoption on October 13, 2011, which stated that the parental rights of both Mother and Father were terminated.

Mother subsequently filed a notice of appeal and a Uniform Civil Affidavit of Indigency.[2] Father's parents responded by filing a motion to amend the trial court's order and to make additional findings of fact, or for a new trial. The trial court conducted a motion hearing on December 6. Mother did not appear at the hearing. However, the court subsequently filed a new order, appointing an attorney for Mother and stating, "[i]n light of the constitutional right of parenting which was at issue at trial, and the possibility [Mother] was indigent during litigation, the Court finds it appropriate to set aside the Final Order of Adoption and set this matter for new trial."

_____

[2]The filing of an appeal from a final order normally deprives the trial court of jurisdiction in the case appealed from. Mother apparently dropped her appeal prior to the entry of the trial court's subsequent order.

On February 13, 2012, Mother filed a motion with the court requesting limited visitation with the children pending the outcome of the final hearing, and asserting that such visitation was in the best interest of the children. The hearing on the motion was conducted on February 22, 2012. During the hearing, the Guardian ad litem asked Mother when she last used inhalants. She responded, "December 13, 2011," and she repeated that date in response to a follow-up question.

The Guardian ad Litem subsequently filed a motion for a restraining order to prohibit Mother from having any contact, direct or indirect, with the children. The motion stated that after the hearing on Mother's motion for visitation, he received a message from Mother's probation officer informing him that Mother had been arrested on February 21, 2012, resulting in two criminal charges, for public intoxication and inhalants. The Guardian attached to his motion copies of the sworn Affidavit of Complaint, and Mother's Appearance Bond, showing that she bonded out of jail on the morning of February 22, 2012. The trial court granted the restraining order, citing Mother's untruthfulness and the risk of injury to the children if Mother were allowed to be in their presence.

## II. THE FINAL TERMINATION HEARING

The trial court conducted its second hearing on the paternal grandparents' termination petition on April 17, 2012. For the convenience of the witnesses, the court agreed to hear evidence relevant to grounds for termination and to the best interest of the children at the same time, rather than bifurcate the hearing. Testifying witnesses included Mother, Father, Father's parents, Mother's mother, Father's sister, and the police officer who had arrested Mother on February 21, 2012. Mother was in jail at the time of the hearing for violating probation, but was released for the purpose of testifying.

Father's mother testified that she asked the juvenile court to grant custody of the children to the paternal grandparents because they were concerned about the parents' drug use. She further testified that she was aware that Mother had been arrested several times before the petition for termination of parental rights was filed, and that "[t]here were several times I have gone with her to court, have bailed her out of jail, have helped her get her driving record cleaned, paid off her fees."

Father's mother further testified that the paternal grandparents were in good health, financially secure, and fully capable of meeting the needs of their grandchildren. She also explained that the children have health issues, some of which require daily medication. Both children suffer from eczema, asthma and allergies, and Drako has an enlarged colon. Father's mother stated that she was concerned about Mother giving the children their medication as prescribed and that any time Drako became ill and needed to go to the hospital

-5-

while in the parents' care, they would hand him over to her, and she would take the child to the emergency room.

The proof showed that the children usually stayed overnight with Father and Mother several days every week before they decided to separate. Father testified that when he called Mother from work to check on the children, she often failed to answer, and that he had to call his parents so they would go to the house to find out what was happening. He described one incident when he returned from work early and found the children running around the house unsupervised while Mother was passed out on the bed. Father's mother also testified that she sometimes went to the couple's house and found Mother asleep while the children were up and around.

The home that Father and Mother had shared was owned by Father's parents. Father testified that "we tried to pay rent but we usually didn't." Although he had a job, he and Mother never contributed financially to the support of their children. One reason was the cost of the drugs he and Mother were using on a regular basis. Father explained that both of them abused prescription drugs like Oxycontin, usually grinding the pills into a powder and then inhaling the powder through a straw. He testified that the price per pill was usually between $45 and $60. Father admitted that he and Mother sometimes did drugs in the presence of the children. He also admitted that they had allowed the children to share sips of their alcoholic drinks, and that at the time he thought that it was funny to see the children get dizzy and stumble around.

Father was asked about the reason for his separation from Mother. He testified that they argued because Mother "started going out in the clubs and drinking a lot more and getting back on drugs and I just – I didn't want to deal with it anymore." Father and Mother agreed to separate on the day before the incident at the mall, but Mother was unable to leave the marital home because she did not have her own transportation. On or about February 15, 2011, however, Mother's grandmother bought her a car. Mother used the car to move out of the marital home. She had no fixed address over the following months, but moved between the residences of different friends. Father further testified that Mother returned to the house a few times after the separation, and that during each visit, she inhaled from numerous cans of compressed air, "air duster," to get high.[3]

_____

[3]Father testified that when she came over to the house during this period, he talked to her about quitting her habit of substance abuse and she would say that she was stopping, but she would nonetheless continue, on one occasion leaving 26 emptied cans of inhalant behind. At one point, Father put images of the two children on the television set to show Mother why she needed to quit, but ". . . she just sat there and cried and kept huffing it while she was watching it."

There were discrepancies between Mother's testimony about her efforts to visit the children in the four months prior to the filing of the petition for termination, and the testimony of Father's mother. Father's mother testified that Mother did not send any e-mails or make any phone calls in those four months to ask for a visit with the children.[4] Mother testified to the contrary that she tried calling Father's parents many times during the relevant period, but that they did not answer. She also testified that Father told her she could not visit because there was a restraining order against her.

Mother objected to testimony and other evidence about her conduct outside of the four month period that is relevant to the statutory definition of abandonment at Tenn. Code Ann. § 36-1-102(1)(A)(i). But the trial court admitted the evidence over Mother's objection because it was relevant to the question of the best interest of the children. That evidence included Mother's criminal record, which documented multiple arrests and convictions between December of 2006 and March of 2012 for such offenses as public intoxication, use of inhalants and shoplifting. Mother was also impeached when she admitted under questioning that even though she testified at the earlier motion hearing that she had not used inhalants since December 2011, she had in fact been arrested the night before that same motion hearing for using inhalants.

When Mother's mother was called to the stand, she testified that Father's parents allowed her to see the children on a regular basis several times a week before January of 2011, but that starting in February, they told her she could see the children only if she would not allow any contact with Mother. Mother's mother stated that Mother called her often during this period, asking about the children and begging to be allowed to see them, but "I told her I couldn't . . . because I didn't want to risk my chances of not getting to see those boys."

The court filed a Final Order in this case on May 8, 2012, setting out its findings of facts and conclusions of law. The court declared that it was unable to find, by clear and convincing evidence, that Mother had willfully failed to visit the children during the relevant four month period. The court did find, however, that Mother had abandoned the children by willfully failing to support them during that same period. The court them went on to analyze the best interest of the children. It found that in light of Mother's prior neglect of the children, her long history of drug abuse, and her arrest record, it was in their best interest that her parental rights be terminated. The court accordingly terminated the parental rights of

---

[4]The proof showed that Mother briefly visited with the children at the home of her parents in February 2011.

both Mother and Father and granted Father's parents' petition for adoption. This appeal followed.

### III. THE STANDARD OF REVIEW

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody and control of his or her own child. *Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); Nash-Putnam v. McCloud, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While this right is fundamental, it is not absolute. The state may interfere with parental rights, through judicial action, in some limited circumstances. *Santosky,* 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights, by setting forth the grounds upon which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr,* 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Persons seeking to terminate another's parental rights must prove two things. Tennessee Code Annotated § 36–1–113(c) requires that termination of parental rights must be based upon: (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental rights have been established; and (2) that termination of the parent's rights is in the best interests of the child. Both grounds and best interests must be proved by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

This heightened burden of proof is one of the safeguards required by the fundamental rights involved, *Santosky*, 455 U.S. at 769. Its purpose is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re Angela E.*, 303 S.W.3d at 250; *In re M.W.A.*, 980 S.W.2d at 622.

The party seeking termination need establish the existence of only one statutory ground to support a termination. *In re Angela E.*, 303 S.W.3d at 251; *In re Valentine*, 79 S.W.3d at 546. If at least one ground is established by clear and convincing evidence, only then does the trial court or the reviewing court conduct a best interests analysis. *In re Angela*

*E.*, 303 S.W.3d at 251 (citing *In re Marr,* 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)).

The Tennessee Supreme Court has explained the standard this court uses to review a trial court's decision in a termination of parental rights case:

> We review the trial court's findings of fact de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); . . . We review "the trial court's ruling that the facts of [a] case sufficiently support the termination ground of willful abandonment," a conclusion of law, de novo with no presumption of correctness.

*In the Matter of M.L.P.,* 281 S.W.3d 387, 393 (Tenn. 2009) (citing *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)).

## IV. THE GROUND OF ABANDONMENT

### A. Failure to Support

A statutorily-designated ground for termination of parental rights is that "abandonment by the parent or guardian, as defined in § 36-1-102 has occurred." Tenn. Code Ann. § 36-1-113(g)(1). The relevant definition of abandonment in Tenn. Code Ann. § 36-1-102 reads as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i).

Because of the constitutional dimensions of a parent's right to the care and custody of a child, the parent's failure to pay support for or to visit a child in the custody of another does not constitute a valid ground to terminate that parent's rights unless the failure is found to be "willful." *In re Swanson,* 2 S.W.3d 180 (Tenn. 1999); *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *Menard v. Meeks,* 29 S.W.3d 870, 874 (Tenn. Ct. App. 2000).

A parent's failure to support is willful if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In re M.L.D.*, 182 S.W.3d at 896;

*In re Adoption of Muir,* No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003) (no Tenn. R. App. P. 11 application filed). A parent who fails to support a child because he or she is financially unable to do so does not willingly fail to support the child. *O'Daniel v. Messier,* 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

In the present case, Mother acknowledges that she did not make any payments toward the support of her children during the statutory four month period. She argues, however, that her failure was not willful, because there was no court order requiring support and she did not have any income during the relevant period. She did, however, testify that she was aware of her duty to support her children, and that "If I had the money to do so at the time, I would have."[5]

Mother's argument therefore boils down to the questions of whether she had the capacity to pay support, whether she made any effort to do so, and if there is any excuse for her failure. The evidence in the record relevant to these questions is admittedly meager (perhaps because the focus of testimony was on visitation rather than on support) but it all points in the same direction.

When Father and Mother were together, they took care of the children several days a week. Father worked, and his parents gave the couple additional financial support. They also received food stamps. Mother was able to stay home and watch the children, although Father's testimony indicated that she was not nearly as attentive as she should have been. But after Father and Mother separated, Mother's income sources (including the food stamps) disappeared, and she no longer cared for the children.

The trial court found that Mother was able-bodied, and there was no evidence to the contrary. The proof also showed that she was employable. Mother testified that she held a job at Black Eyed Pea for almost a year, including when she was pregnant with Drako. The last job she held was at Chili's Restaurant. She stated that she had been laid off from that job in December of 2010, but that she did not remember why she was laid off. Asked why she was not working in January or February or March of 2011, she answered, "I really don't have a reason for that."

If Mother had testified that she had looked for a job but couldn't find one, or that she

---

[5]Tenn. Code Ann. § 36-1-102(1)(H) states that "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Thus, the obligation to pay support exists even in the absence of a court order to do so. *State Dept. of Children's Services v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004); *In re J.C.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004).

had found a job, but that her earnings were only enough to pay for her personal expenses, then there might be a different answer to the question of whether she made an attempt to provide support for the children. But under the circumstances, the only conclusion we can reach is that no such attempt was made, and that therefore her failure to support her children was willful.

If we look for the reason why Mother did not attempt to support her children, we might conclude that she knew that they were being taken care of by Father's parents, and that her abuse of inhalants and other drugs rendered her incapable of understanding that she also needed to take responsibility for their care. But reasons are not the same as excuses. In sum, we affirm the trial court's finding that Mother abandoned her children by wilfully failing to support them.

### B. Failure to Visit

Father's parents argue on appeal that the trial court erred in declining to find as an additional ground for termination that Mother had abandoned the children by willfully failing to visit them in the four months proceeding the filing of their termination petition. The court noted that the evidence showed that Mother did have contact with the children on January 23 and February 7, 2011, and it found that there were no barriers to further contact with the children if Mother so desired. But the court declared that because of the two contacts it cited, it could not find, by clear and convincing evidence, that this constituted abandonment under the statutory definition.

Father's parents do not dispute this evidence, but they note that Tenn. Code Ann. § 36-1-102(1)(E) states that, "'willfully failed to visit' means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation," and that "token visitation," is visitation, which "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). They accordingly argue that Mother's two visits with the children were nothing more than "token visitation" and, thus, did not preclude the trial court from finding a willful failure to visit.

But even if Mother's visitation with the children can be characterized as "token," the question remains whether her failure to visit more frequently can be considered "willful" under the circumstances of this case. The proof showed that Father's parents were adamantly opposed to allowing Mother to have any contact with the children after the incident at the mall and after reports of her continuing drug use reached them. They filed a petition in the Juvenile Court to have Mother barred from any further contact with the children, and they

succeeded in obtaining an order that limited such contact to supervised visitation in their presence. They also threatened to withhold the children from Mother's parents if they allowed their daughter to see the children.

Accordingly, when Mother asked her own mother if she could see the children, she was refused. When she asked Father if she could see them, he told her that there was a restraining order against her. The order that Father was apparently referring to did not explicitly prohibit visitation by Mother, but provided that such visitation could only take place under the supervision of Father's parents. Petitioners argue that if Mother was truly interested in seeing the children, she would have investigated further to learn the exact terms of the order in question. But in light of the continuing efforts by Father's parents to restrict or eliminate Mother's visitation, we cannot conclude there was clear and convincing evidence that her failure to visit was willful.

## V. BEST INTEREST

Once a ground for termination has been proved, the trial court then must then look to whether termination of parental rights is in the best interest of the children involved. For the guidance of the trial courts, our legislature has set out a list of non-exclusive factors for them to consider in making that determination. Tenn. Code Ann. § 36-1-113(i). Herein, the trial court discussed each of the relevant factors in its final order and determined that almost every one of them indicated that it was in the children's best interest that Mother's parental rights be terminated.[6]

---

[6]Tenn. Code Ann. § 36-1-113(i) reads,

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or

These included Mother's failure to make an adjustment in her circumstances that would make it safe for the children to return to her home, Tenn. Code Ann. § 36-1-113(i)(1); her failure to maintain regular visitation with the children, Tenn. Code Ann. § 36-1-113(i)(3); her neglect of the children while in her home, Tenn. Code Ann. § 36-1-113(i)(6); her use of alcohol or controlled substances in the home that rendered her consistently unable to care for the children in a safe and stable manner, Tenn. Code Ann. § 36-1-113(i)(7); and her failure to pay child support, Tenn. Code Ann. § 36-1-113(i)(9).

We need not reiterate the trial court's analysis in detail, but suffice it to say that we find that the evidence does not preponderate against the trial court's findings of fact and we find no error in its application of the statutory factors to the evidence presented at trial. There was overwhelming evidence in this case that the two children are thriving under the care of Father's parents, who are willing and able to meet all their needs, including their medical needs. Conversely, Mother has shown herself again and again to be indifferent to or unaware of, her parental responsibilities. There was no evidence presented of any willingness on her part to deal with her substance abuse problem. On the contrary, her problem appears to have worsened since the petition for termination was filed and to have led to frequent incarceration. In sum, there is clear and convincing evidence that it is in the best interest of the children that Mother's parental rights be terminated.

We must, however, address Mother's argument as to another factor not specifically mentioned in Tenn. Code Ann. § 36-1-113(i), but potentially applicable nonetheless, because the statute states that "the court shall consider, but is not limited to, the following [enumerated factors]." Mother argues that it was inequitable to terminate her parental rights and to thereby foreclose the possibility of any further contact between her and the children, while Father's parents intend to give Father continuing access to the children, despite the termination of his parental rights.

After a ground for termination has been proved, the focus of the proceedings necessarily shifts to the best interests of the child, and although the parent's interests do not evaporate at that point, they have to give way if the best interest of the children so requires. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). In fact, our legislature has declared that "[i]n all cases, when the best interests of the child and those of the adults are

---

controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

-14-

in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child." Tenn. Code Ann. § 36-1-101(d). We know of no authority to suggest that a decision by adoptive parents to allow a child contact with one biological parent and not the other is relevant to or militates against a finding that termination of parental rights is in the best interests of a child.

We accordingly affirm the trial court's final order.

## VI.

The judgment of the trial court is affirmed. We remand this case to Circuit Court of Sumner County for any further proceedings necessary. Tax the costs on appeal to the appellant.

_____
PATRICIA J. COTTRELL, P.J., M.S.